## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

Leslie D. Nolan, individually and
on behalf of all others similarly situated,

     Plaintiff,

v.

                           Case No. _____
                           Hon. _____

The Detroit Edison Company;
DTE Energy Corporate Services LLC,
an Affiliated Company of the Detroit
Edison Company; DTE Energy Company
Retirement Plan; DTE Energy Benefit Plan
Administration Committee; Janet Posler, as
Designated Representative for DTE Energy
Benefit Plan Administration Committee;
Qualified Plan Appeals Committee [Michael
S. Cooper, Renee Moran, Jerome Hooper]

Defendants.

_____

Eva T. Cantarella (P51917)
Bradley J. Schram (P26337)
Robert P. Geller (P34391)
Patricia A. Stamler (P35905)
Hertz Schram PC
1760 S. Telegraph Rd.
Bloomfield Hills, MI 48302
o. 248-335-5000; f. 248-3353346
ecantarella@hertzschram.com
*Attorneys for Leslie Nolan and all*
*others similarly situated*

_____

## PLAINTIFF LESLIE D. NOLAN'S CLASS ACTION COMPLAINT

Plaintiff Leslie D. Nolan ("Nolan"), by and through her attorneys Hertz Schram PC, brings this Complaint on behalf of herself and all other similarly situated persons against (i) The Detroit Edison Company ("DTE"); (ii) DTE Energy Corporate Services LLC, an Affiliated Company of the Detroit Edison Company ("DTE Energy") (DTE and DTE Energy are hereafter collectively referred to as "DTE" unless the context requires otherwise), (iii) DTE Energy Company Retirement Plan ("Plan"); (iv) DTE Energy Benefit Plan Administration Committee ("Administration Committee"); (v) Janet Posler ("Posler"), the Designated Representative for the Administration Committee and the individual who initially denied Nolan's administrative Claim; and (vi) the Qualified Plan Appeals Committee ("Appeals Committee"), consisting of Michael S. Cooper, Renee Moran, and Jerome Hooper, who denied Nolan's administrative Appeal (collectively, "Defendants").[1] In support of her Complaint, Nolan states the following:

## Jurisdiction and Venue

1.    This Court has jurisdiction over the parties pursuant to §502(a), (e), and (f) of the Employee Retirement Income Security Act ("ERISA"). 29 U.S.C. §1132(a), (e), and (f).

2.    Subject matter jurisdiction exists pursuant to 29 U.S.C. §1132(e)(1).

---

[1] Unless otherwise stated, discussed, or defined herein, all capitalized terms shall have the meaning ascribed to them in the Plan.

3.     Venue is proper pursuant to 29 U.S.C. §1132(e)(2).

**Overview of the Dispute**

4.     This is a case about broken promises, misrepresentations, and material omissions on the part of Defendants that induced an election on the part of Nolan and other similarly situated persons that substantially reduced their pension benefit payable upon retirement.

5.     During a two-month window in the Spring of 2002, DTE invited employees who participated in its "traditional" pension plan ("the Traditional Plan")-- a plan that computed the pension as a percentage-of-pay times years of service--to transfer to its new "cash balance" pension plan ("Cash Balance Plan")–a plan that computed the pension by reference to a hypothetical account to which the Plan added hypothetical Interest Credits and Contribution Credits.

6.     At such time, a single pension plan document, effective December 31, 2001, subsumed the Traditional Plan and Cash Balance Plan ("the 2001 Plan") (Ex. 1), and that structure remains intact today despite numerous amendments to the Plan.[2]

---

[2] The 2001 Plan was subsequently amended 19 times, restated effective January 1, 2010 ("the 2010 Plan"), amended another 14 times, restated again effective January 1, 2014 ("the 2014 Plan"), and then amended at least another 7 times. Despite these amendments, the 2001 Plan exclusively applies to Nolan's Claims because it is the Plan that was in effect when DTE invited Nolan and other DTE employees to transfer to the new Cash Balance Plan.

7.     In connection with its invitation, DTE promised its employees that if they elected to transfer to the Cash Balance Plan they would receive (A) the "frozen and protected" pension benefit they earned under the Traditional Plan before the transfer, plus (B) the benefit they would earn thereafter under the Cash Balance Plan ("the A+B Benefit Promise").

8.     DTE expressed the A+B Benefit Promise in <u>both</u> the 2001 Plan and a Retirement Choice Decision Guide ("Decision Guide") (Ex. 2) DTE distributed to employees invited to transfer to the Cash Balance Plan.

9.     Under the A+B Benefit Promise, if a Participant earned (A) a $600 monthly annuity under the Traditional Plan before transferring to the Cash Balance Plan, and (B) a $500 monthly annuity thereafter under the Cash Balance Plan, the Participant would be entitled to a pension benefit at retirement equal to $1,100/month.

10.     When Participants retired, however, DTE ignored its covenant to compute their pension benefits in accordance with the A+B Benefit Promise. Instead, DTE used a "larger of" methodology whereby it compared the pension the Participant earned under the Traditional Plan before the transfer to the pension the Participant earned under the Cash Balance Plan after the transfer, and paid the Participant only the "larger of" the two amounts.

11.    DTE's "larger of" methodology deprives Participants of pension benefits they earned and are entitled to receive under the A+B Benefit Promise.

12.    For example, under DTE's "larger of" methodology, if a Participant earned a $600 monthly annuity under the Traditional Plan before transferring to the Cash Balance Plan and a $500 monthly annuity thereafter under the Cash Balance Plan, the Participant's pension benefit at retirement would equal only the "larger of" these amounts, or $600/month, meaning the $500 monthly pension the Participant earned under the Cash Balance Plan was effectively forfeited and **the Participant earned no new pension benefits while participating in the Cash Balance Plan.**

13.    Similarly, if this same Participant earned a $500 monthly annuity under the Traditional Plan before transferring to the Cash Balance Plan, and a $600 monthly annuity thereafter under the Cash Balance Plan, the Participant's pension benefit at retirement under DTE's "larger of" methodology would equal $600/month, meaning the $500 monthly pension the Participant earned under the Traditional Plan was effectively forfeited.

14.    If a Participant remained in the Traditional Plan, neither of the two "forfeiture" outcomes would be possible, as the Participant would continue to accrue pension benefits until the cessation of his or her employment.

15.    Nowhere in the 2001 Plan or Decision Guide does DTE use the term "larger of," "greater of," or any variation of the two in expressing a Participant's pension benefit at retirement.

16.    DTE inexplicably omitted these commonly used and easily understood terms in explaining the pension payable to Participants who transferred to the Cash Balance Plan.

17.    A cynic could speculate that the reason DTE omitted those terms is obvious: Paying A **or** B plainly costs less than paying A **plus** B, but no DTE employee would have elected to transfer to the Cash Balance Plan if he or she had been informed of DTE's intent to use the "larger of" methodology to compute their pension at retirement <u>and the adverse impact of that methodology on the amount of their pension benefit</u>.

18.    So, DTE elected to omit this important piece of information in both the 2001 Plan and Decision Guide, thereby reaping significant benefits for itself at the expense of DTE employees who unwittingly elected to transfer to the Cash Balance Plan.

19.    In March/April of 2002, Nolan elected to transfer to the Cash Balance Plan.

20.    At the time, she had 22½ years of service with DTE and had earned a pension under the Traditional Plan in the amount of $1,581.19/month.

21.    When Nolan retired from DTE 15½ years later in December of 2017 (at 38 years of service), DTE represented to her that she had earned a pension under the Cash Balance Plan in the amount of $987.83/month.

22.    In light of the A+B Benefit Promise *and DTE's representation of the Cash Balance Plan benefit amount*, Nolan's total pension benefit *should* have equaled $2,569.02/month ($1,581.19/month Traditional Plan benefit + $987.83/month Cash Balance Plan benefit = $2,569.02/month).

23.    Following Defendants' administrative denial of Nolan's Claim for the A+B Benefit, Nolan retained an actuary to review DTE's pension calculations. Nolan's actuary determined that the annuity derived from the Contribution Credits and Interest Credits to her hypothetical account under the Cash Balance Plan equals $402.55/month at Nolan's early retirement age of 59 years and 3 months, meaning Nolan's A+B Benefit was actually $1,983.74/month ($1,581.19[3] + $402.55 = $1,983.74).    At no time during the administrative proceedings (or at any time thereafter) did DTE advise Nolan that her Cash Balance annuity at her retirement age of 59 years and 3 months was NOT $987.83/month. Therefore, in the administrative proceedings, Nolan requested an A+B Benefit based on $987.83/month as the "B"

---

[3]    Nolan was entitled to this amount without any actuarial reduction for benefit commencement before age 65 because (i) under the Traditional Plan, Participants are entitled to receive the age-65 benefit as early as age 58 if they have at least 30 years of service; and (ii) Nolan had 38 years of service.  2001 Plan at §6.08 (Ex. 1 p 40).

component of the Benefit Promise.

24.     Whether Nolan's Cash Balance benefit was $987.83/month or $402.55/month would not have made any difference to DTE, as it concluded that Nolan was only entitled to the "larger of" the pension she earned under the Traditional Plan and Cash Balance Plan; that is, the benefit she earned under the Traditional Plan 15½ years earlier, or $1,581.19/month.  This meant that, **for the entire 15½ years Nolan participated in the Cash Balance Plan, she earned no new pension benefits.**

25.     Nolan seeks to recover for herself and all other similarly situated persons who elected to transfer to the Cash Balance Plan (i.e., the "Class Members"), the greater of--

> (i) the pension benefits DTE promised under the A+B Benefit Promise; that is, (A) the "frozen protected" pension benefit earned under the Traditional Plan before the transfer **plus** (B) the pension benefit earned under the Cash Balance Plan after the transfer; and

> (ii) the pension payable if they had remained in the Traditional Plan (i.e., not elected to transfer to the Cash Balance Plan),

less any amount Nolan and the Class Members actually received.

## The Parties

<u>Plaintiff</u>

26.     Nolan worked for DTE for 38 years, from December 17, 1979 until December 1, 2017, the date she retired.

27.     She last worked for DTE as a Financial Analyst.

28.     During her tenure with DTE, Nolan participated in two pension plans sponsored by the company (discussed below).

<u>Defendant Plan</u>

29.     Nolan first participated in the Employees' Retirement Plan of the Detroit Edison Company [**not a defendant**] (also referred to in the 2001 Plan as the "Prior Plan")[4]--a "traditional" defined benefit pension plan in that the retirement benefit was computed as a percentage-of-pay times years of service, and paid as a monthly annuity.

30.     She next participated in the defendant Plan–the product of an amendment, restatement, and name change of the Prior Plan, effective December 31, 2001.  <u>See</u> 2001 Plan at Preamble and §2.75 (Ex. 1 pp1, 14).

31.     As discussed, the 2001 Plan includes both (i) DTE's long-existing Traditional Plan, and (ii) a new DTE Cash Balance Plan, which computes benefits by reference to a "hypothetical" account to which Contribution Credits and Interest Credits are added, and pays the benefit in the form of a lump sum or annuity (Participant's choice).  2001 Plan §§5.01, 5.02, 7.03(b) (Ex. 1 pp32-34, 57-58).

---

[4]  <u>See</u> 2001 Plan at Preamble and §2.75 (Ex. 1 pp1, 14).

32.     Significantly, §6.01 of the 2001 Plan, as well as all later versions of the Plan, set forth a two-part formula for computing a Participant's Accrued Benefit, such that the benefit equals the Accrued Benefit earned under the Traditional Plan **plus** the Accrued Benefit earned under the Cash Balance Plan.  2001 Plan at §6.01 (Ex. 1 p37). Thus, if a Participant participated in both Plans, the Participant's Accrued Benefit would equal (A) the pension the Participant earned under the Traditional Plan before the transfer **plus** (B) the pension the Participant earned under the Cash Balance Plan after the transfer (i.e., the A+B Benefit Promise).[5]

33.     Nonetheless, during the administrative proceedings on Nolan's Claims, Defendants repeatedly attempted to justify DTE's use of the "larger of" methodology by referring to provisions of the Plan that (i) DTE amended <u>years</u> <u>after</u> it offered the Cash Balance choice; (ii) DTE grossly misinterpreted so as to achieve its desired "larger of" outcome; and (iii) were otherwise irrelevant.

34.     As importantly, none of those amendments contemplates the "larger of" methodology DTE utilized to compute Nolan's pension at retirement.

---

[5] This A+B Benefit Promise was also made in the Decision Guide (Ex. 2) DTE provided to employees it invited to transfer to the Cash Balance Plan.  The Decision Guide will be discussed, in detail, later in this Complaint.

The Other Named Defendants

35.     Defendant DTE was the Sponsor and Plan Administrator of the 2001 Plan from its inception until May 1, 2008 when the Plan was amended to designate defendant DTE Energy as the Plan Sponsor and Plan Administrator of the 2001 Plan. See 2001 Plan at §§2.19, 2.71, 2.72, 9.01 (Ex. 1 pp7, 13, 79), and May 1, 2008 Amendment to 2001 Plan (Ex. 3).

36.     As reported on DTE Energy's website on October 26, 2018, DTE Energy is a Detroit-based energy company with over 10,000 employees, over 2.2 million customers, and a portfolio that includes "non-utility energy businesses focused on power and industrial projects, natural gas pipelines, [energy] gathering and storage, and energy marketing and trading."[6]

37.     For the 2016 year, DTE Energy reported $10.6 billion in operating revenues, $838 million in net income, and $32 billion in assets.  Id.

38.     Under the Plan, the Plan Administrator may delegate its Plan administration duties to others, including to defendant Administration Committee. 2001 Plan, Article IX (Ex. 1 pp79).

39.     Nolan's Claim was initially decided and denied by defendant Posler, the Designated Representative for the Administration Committee.

---

[6] https://newlook.dteenergy.com/wps/wcm/connect/dte-web/home/about-dte/common/about-dte/about-dte

40.     Posler is a DTE Energy employee in the company's Human Resources Retirement Income department.

41.     As represented in a letter to Nolan signed by defendant Michael S. Cooper ("Cooper"), Nolan's Appeal was decided and denied by defendant Appeals Committee, which Nolan later learned consisted of defendants Cooper, Renee Moran, and Jerome Hooper.[7]

### General Allegations

42.     As noted, Nolan retired from DTE in December 2017 after serving the company for 38 years.

43.     In September 2017, in anticipation of Nolan's impending retirement, DTE sent Nolan a four-page Pension Calculation Statement ("PCS") that included Nolan's payment options and the pension she would receive under each option if she retired on December 2, 2017 (Ex. 4).

44.     The PCS displayed myriad numbers, contained numerous undefined terms Nolan did not understand, and omitted an explanation of the methodology used to determine her pension benefit amounts.  Id.

45.     Therefore, on October 14, 2017, Nolan sent a letter to the Plan Administrator requesting (i) clarification of the undefined terms in the PCS and the

---

[7] Unless the context requires otherwise for clarity, all named defendants (except the Plan) will generally hereinafter be referred to, individually and collectively, as DTE.

methodology used to determine her pension amounts, (ii) copies of the Plan (both before and after it added the new Cash Balance Plan), and (iii) copies of the Plan's summary plan descriptions ("SPDs").  <u>See</u> Letter from Nolan to Plan Administrator, dated 10/14/2017 (Ex. 5).

46.    A few weeks later, Emily Sharp ("Sharp"), DTE's Supervisor of Retirement Income Benefits, sent Nolan (i) most of the documents she had requested, <u>but notably NOT any SPD in effect in 2002 when DTE offered the Cash Balance choice</u>, providing instead a more recent SPD that reflected updates through <u>2016,</u> and (ii) a letter from Sharp, dated November 6, 2017, stating that it was in response to Nolan's October 14, 2017 document and information request.  <u>See</u> Letter from Sharp to Nolan, dated 11/06/2017 (Ex. 6).

47.    Sharp's letter further explained that, in determining the pension payable to Nolan on December 2, 2017 (Nolan's retirement date), DTE compared (A) the pension Nolan had earned under the Traditional Plan as of May 31, 2002 (the date immediately preceding Nolan's transfer to the Cash Balance Plan), which was $1,581.19/month, to (B) the pension Nolan earned under the Cash Balance Plan thereafter, which Sharp represented to equal $987.83/month, and selected the "larger of" these two amounts, which was the pension Nolan earned under the Traditional Plan <u>15½ years earlier</u>.  <u>See</u> Letter from Sharp to Nolan (Ex. 6 ¶¶4, 7 and 9).

48.    <u>In other words, DTE concluded that Nolan was entitled to no new</u>

pension benefits for the 15½ years she participated in the Cash Balance Plan.

## The Administrative Proceedings

Nolan's Claim

49.     On January 9, 2018, Nolan submitted a Claim for additional pension benefits to DTE's "Pension Plan Claims" department.  See Claim (Ex. 7).

50.     In her Claim, Nolan objected to DTE's use of the "larger of" methodology for computing her pension because both (i) the terms of the Plan, and (ii) the written representations in the Decision Guide DTE distributed to employees invited to make the Cash Balance choice mandated use of a "sum of" or "plus" methodology consistent with the A+B Benefit Promise.  Id.

51.     Nolan argued that §6.01 of the 2001 Plan and §6.01 of all later versions of the Plan unambiguously enunciate a two-part formula for computing a Participant's Accrued Benefit under the Plan:

> **Section 6.01  Accrued Benefit.** Except as provided in the Citizens Appendix to this Plan, a Participant's Accrued Benefit shall be determined as follows:

(a)    **Formula.**

    (1) **DTE and MCN Traditional Plan Participants.** *At any point in time*, a DTE or MCN Traditional Plan Participant's Accrued Benefit, payable in the Normal Form commencing on the Participant's Normal Retirement Date, shall be calculated in accordance with Sections 6.02 through 6.05, as applicable.

    (2) **DTE and MCN Cash Balance Plan.** *At any point in time*, a DTE or MCN Cash Balance Plan Participant's Accrued Benefit, payable in the Normal Form commencing on the Participant's Normal Retirement Date, shall be the Actuarial Equivalent of the Participant's Cash Balance Account, as described in Article V.

2001 Plan at §6.01 (italics added) (Ex. 1 p37).   Consequently, if a Participant participated in the Traditional Plan before the transfer and Cash Balance Plan subsequent to the transfer, the Participant's Accrued Benefit would equal (A) the pension the Participant earned under the Traditional Plan, **plus** (B) the pension the Participant earned under the Cash Balance Plan.  See 2001 Plan at §§6.01(a)(1) and 6.01(a)(2) (Ex. 1 at p37).

52.    This interpretation of §6.01 of the 2001 Plan is further supported by §2.01 of the 2001 Plan, which defines the term "Accrued Benefit" by reference to multiple formulas:

    **Section 2.01 "Accrued Benefit"** means the benefit that a Participant has earned under the Plan *on any given date*, without regard to the Participant's nonforfeitable right to such benefit, and computed in accordance with the applicable Accrued Benefit formulas [plural] in Article VI.

2001 Plan at §2.01 (Ex. 1 p3) (italics added).

53.    Nolan emphasized that the 2001 Plan omits any mention of a "larger of" methodology for computing a Participant's Accrued Benefit.  Claim (Ex. 7).

54.    Nolan also contended that the "larger of" methodology conflicted with representations DTE made to her and other DTE employees invited to transfer to the Cash Balance Plan, as such representations never suggested they would receive the "larger of," "greater of", or "only one of" the benefits they earned under the Traditional Plan and Cash Balance Plan.   Claim (Ex. 7).

55.    Likewise, the representations omitted any disclosure that Participants who transferred to the Cash Balance Plan might earn no new benefits for an extended period of time, possibly years, or even never (Nolan's situation).  Id.

56.    On the contrary, DTE represented to Nolan and the other DTE employees that if they transferred to the Cash Balance Plan they would receive the "frozen" and "protected" pension they had earned under the Traditional Plan **plus** the benefits they would earn under the Cash Balance Plan.  Id.

57.    To substantiate these assertions, Nolan cited the Decision Guide (Ex 2) DTE distributed to its employees to "help" them decide whether to remain in the Traditional Plan or, instead, transfer to the Cash Balance Plan.

58.    As an initial matter, the Decision Guide states that it is the "primary source" of printed information about the Cash Balance Plan choice:

> Begin reviewing this Decision Guide. It serves as your
> primary source of printed *Retirement Choice* information.

Decision Guide (Ex. 2 p5) (italics in original).

59.     Nolan also stressed that page 7 of the Decision Guide explicitly promises

that the Traditional Plan benefit will be "frozen" and "protected":

> Once you are **vested**, you are eligible for the greater of any
> Traditional Pension Plan retirement benefits you have
> accrued as of December 31, 2001 or May 31, 2002, the
> dates on which your Traditional Pension Plan benefit is
> frozen and protected.

Claim (Ex. 7 p2) citing Decision Guide (Ex. 2 p7) (underline added).

60.     Significantly, in the same paragraph, the Decision Guide expressly used

the term "greater of" with respect to the alternative benefit determination dates, but

never used that term or any variation thereof in describing the benefit determination

methodology for those who participated in both the Traditional Plan and Cash

Balance Plan.

61.     Nolan further insisted that pages 8 and 10 of the Decision Guide

represent that the Cash Balance Plan benefit will increase each year with

"Contribution Credits" and "Interest Credits":

> <u>Your cash balance pension benefit increases each year with</u>
> <u>two types of credits</u>:
> ● **Contribution credits** - Equal to 7% of your eligible
> earnings each year.
> ● **Interest credits** - Based on average **30-year Treasury
> rates\*** for the month of September prior to the plan year.
> Interest on each year's January 1 benefit is added the
> following December 31. The interest credit does not apply
> to the contribution for the current year.

Decision Guide (Ex. 2 p8) (underline added), discussed in Claim (Ex. 7 p2).

> ● Your cash balance pension benefit is expressed as a lump
> sum. <u>Your cash balance benefit increases each year</u> with:
> – **Contribution credits** - equal to 7% of your eligible
> earnings; and
> – **Interest credits** - based on average 30-year Treasury
> rates for the month of September prior to the plan year.
> Interest on each year's January 1 benefit is added the
> following December 31. The interest credit does not apply
> to the contribution for the current year.

Decision Guide (Ex. 2 p10) (underline added), discussed in Claim Ex. 7 p2).

62. Nolan added that pages 20 through 24 of the Decision Guide contain

<u>eight graphs</u> comparing benefit accruals under the Traditional Plan and Cash Balance

Plan (depending on various assumptions), <u>each showing steady and increasing</u>

<u>pension accruals under the Cash Balance Plan</u>. Claim (Ex. 7 p2) citing Decision

Guide (Ex 2 pp 20-24).

63. Nolan requested that DTE recompute her pension in accordance with the

A+B Benefit Promise under §6.01 of the Plan and as represented in the Decision

Guide; that is, as (A) the pension she earned under the Traditional Plan

($1,581.19/month) **plus** (B) the pension she earned under the Cash Balance Plan ($987.83/month, as represented by Ms. Sharp, DTE's Supervisor of Retirement Benefits), for a total pension of $2,569.02/month (subject to any actuarial adjustments if she took the benefit in the form of a joint and survivor annuity).  Claim (Ex. 7 p2).

64.    As discussed at ¶23, DTE failed to inform Nolan in the administrative proceedings (or at any time thereafter) that the annuity derived from the hypothetical Interest Credits and Contribution Credits to her Cash Balance Account did NOT equal $987.83/month (the amount represented by Ms. Sharp), but, instead, equaled $402.55/month at Nolan's early retirement age of 59 years and 3 months.  Nolan obtained this information only after she retained an actuary to review Defendants' pension calculations following the final administrative denial of her Claims.

65.    In any event, DTE denied Nolan's Claim on the ground that Nolan was entitled to only the "larger of" the pension she earned under the Traditional Plan and Cash Balance Plan, relying primarily on Plan provisions that did not exist when DTE offered the Cash Balance choice.  See February 23, 2018 letter from defendant Posler to Nolan (hereafter, "Initial Denial," Ex. 8).

66.    Nolan appealed the Initial Denial of her Claim, explaining that the Claim was based on the Plan in effect when DTE invited its employees to transfer to the Cash Balance Plan (i.e., the 2001 Plan)–not on Plan provisions DTE adopted years later, and that were irrelevant to her Claim.  Appeal (Ex. 9 pp1-5).

67.    Nolan also referred Posler to a letter dated March 31, 2005 authored by

Geri Schmidtzinsky, Project Manager for DTE's <u>Retirement</u> Service Center, advising

that, in addition to her Cash Balance Plan benefit, Nolan might be eligible for

"additional benefits" under a prior plan if she was a transferred employee:

> Please find enclosed the 2004 Cash Balance Statement.
> This statement reflects the benefits under the New Horizon
> Cash Balance Plan only.   <u>You may be eligible for</u>
> <u>additional benefits under a prior plan if you are a</u>
> <u>transferred employee</u>.

Appeal (Ex. 9 pp4-5) citing Schmidtzinsky Letter to Nolan, 3-31-2005 (Ex. 10)

(underline added).

68.    Clearly, DTE's own Project Manager for <u>retirement benefits</u> believed

persons who transferred from the prior Traditional Plan to the Cash Balance Plan

were entitled to the benefits they earned under each Plan.  Appeal (Ex. 9 p5).

69.    Nolan added that, aside from §6.01 of the Plan, there was an equally if

not more compelling reason to grant her the A+B benefits: DTE's violation of ERISA

§102.  Appeal (Ex. 9 pp5-6).

*ERISA §102*

70.    Under ERISA §102 (29 U.S.C. §1022), plans must state their manner of

operation in clear and understandable terms in a summary plan description ("SPD")

and in any summary of material modifications ("SMM") to the terms of the plan.

Plan administrators must furnish participants with the SPD and SMM, which "<u>shall</u>

be written in a manner calculated to be understood by the average plan participant, and <u>shall</u> be sufficiently accurate and comprehensive to reasonably apprise such participants of their rights and obligations under the plan." Appeal (Ex. 9 p5) quoting ERISA §102 (underline added).

71.     The SPD and SMM must also include the "circumstances which may result in disqualification, ineligibility, or denial or loss of benefits."  <u>Id</u>.

72.     Further, the Department of Labor ("DOL") regulations enforcing ERISA §102 emphasize that, in fulfilling the SPD and SMM requirements, plan administrators must consider the complexity of the plan and the average participant's level of comprehension, and should usually use clarifying examples and illustrations and avoid using technical jargon.  <u>Id</u>. citing 29 CFR §2520.102-2(a).

73.     Additionally, <u>the SPD and SMM must not have the effect of misleading, misinforming, or failing to inform participants</u>.  <u>Id</u>. citing 29 CFR §2520.102-2(b).

74.     If there will be any loss or denial of benefits, the SPD and SMM must clearly identify the circumstances that will engender that outcome.  <u>Id</u>. citing 29 CFR Section 2520-102-3(l).

75.     Nolan observed that the 2001 Plan, and its subsequent versions, all exceed 125 pages (the 2001 Plan is actually 167 pages), and that the Plan is "enormously complex."  Appeal (Ex. 9 p6).

76.     Such length and complexity demanded a rigorous approach to compliance with ERISA §102 when communicating the benefits Nolan and other DTE employees would receive if they accepted DTE's invitation to transfer to the Cash Balance Plan.  Id.

77.     Noting that the last page of the Decision Guide expressly states that it is an SMM for the Plan, Nolan complained that the Guide failed "miserably" to comply with the ERISA §102 requirements.  Id.

78.     As discussed, the Decision Guide expressly states that employees who transfer to the Cash Balance Plan will receive (i) their "frozen" and "protected" benefit earned under the Traditional Plan **plus** a Cash Balance Plan benefit (Ex. 2 pp7-8); and (ii) benefit accruals under the Cash Balance Plan in the form of "Contribution Credits" and "Interest Credits" (Ex. 2 pp 8 and 10, and pp20 through 24).  Appeal (Ex. 9 p6).

79.     As importantly, the Decision Guide nowhere states that if a Participant transfers to the Cash Balance Plan, the Participant will receive only the "larger of" the pension earned under the Traditional Plan and Cash Balance Plan, or that the Participant might earn no new benefits for an extended period of time after the transfer, possibly years, or even never (Nolan's situation).  Appeal (Ex. 9 p6).

80.     Nolan maintained that the failure to disclose this crucial information in the Decision Guide violated ERISA §102.  Id.

81.     At a minimum, the affirmative statements, coupled with the fundamental omissions, led Participants down a different path than purportedly intended by the Plan, resulting in benefit elections substantially influenced by misleading information.

82.     Nolan also rejected any notion that repeated suggestions in the Decision Guided to consult with Ayco, a firm DTE hired to present information about the Cash Balance Plan to DTE employees offered the Cash Balance choice, somehow purged the ERISA §102 violation.  Id. citing Decision Guide (Ex. 2 pp 4, 5, 25, 33, 41).

83.     As Nolan summarized in her Appeal, Ayco prepared a Power Point Presentation ("Ayco PPP") that included numerous charts and graphs representing that employees who transfer to the Cash Balance Plan will receive steady and increasing pension accruals under the Cash Balance Plan.  Appeal (Ex. 9 p6) citing Ayco PPP (Ex. 11 pp18, 19, and 23 thru 26).

84.     Like the Decision Guide, the Ayco PPP omits discussion of any "larger of" benefit construct, or the possibility that new benefits might not accrue for an extended period.  Appeal (Ex. 9 p6) citing Ayco PPP (Ex. 11).

85.     Ayco's critical omissions reinforce the inescapable conclusion that DTE treated cavalierly its obligation to disclose, in unequivocal terms, the potential significant adverse ramifications of participation in the Cash Balance Plan.  Instead, DTE sought to highlight the growth in benefits achievable under the Cash Balance

Plan in a favorable (i.e., increasing) interest rate environment.

86.     In fact, in her denial of Nolan's Claim, Posler contended that Nolan's Traditional Plan benefit was "converted" into her Opening Cash Balance Account; Contribution Credits and Interest Credits were added to the Account; and, therefore, Nolan's Traditional Plan benefit effectively received Interest Credits.  Initial Denial (Ex. 8 p5).

87.     Because DTE used a "larger of" methodology to compute Nolan's pension at retirement, Nolan did not receive any of those Contribution Credits or Interest Credits.  She received only the Traditional Plan benefit she earned 15½ years earlier.

88.     Moreover, as explained in ¶¶92-103, falling interest rates drastically devalued Nolan's Traditional Plan benefit, which DTE present-valued to equal her Opening Account Balance.

89.     Still, Posler insisted that, because Nolan's Traditional Plan benefit was converted into such Opening Cash Balance Account, Nolan was effectively seeking "double" benefits, "which is not provided under the terms of the Plan."  Initial Denial (Ex. 8 p6).

90.     For her first 22 ½ years of Service with DTE, Nolan earned a benefit of $1,581.19/month (payable at age 65) under the Traditional Plan, but the benefit she earned 15½ years later under the Cash Balance Plan was significantly less than this

amount ($987.83/month according to Ms. Sharp; $402.55/month according to Nolan's actuary), and this was AFTER 15½ years of Contribution Credits and Interest Credits added to her Opening Account Balance.  Id.

91.     This fact, alone, demonstrates that application of the A+B Benefit Promise would not result in a double dip to Nolan.

92.     The principal reason Nolan's benefit under the Cash Balance Plan was less than her age-65 Accrued Benefit under the Traditional Plan 15½ years earlier, even after adding Contribution Credits and Interest Credits to her Opening Account Balance, is that interest rates steadily fell during this period.

93.     When an annuity is present-valued to an immediate lump sum, the higher the interest rate utilized to perform that computation, the smaller the lump sum. Conversely, the lower the interest utilized to perform the present-value computation, the larger the immediate lump sum.

94.     When converting an immediate lump sum to an annuity, however, the situation is just the opposite.  The higher the interest rate utilized to make the conversion, the larger the annuity; whereas, use of a lower interest rate will result in a smaller annuity.

95.     The Plan uses (i) a variable 30-year Treasury rate to compute the Opening Account Balance and Interest Credits, and (ii) variable interest rates (30-year Treasury rates until 2008 and, thereafter, "applicable" rates under Internal Revenue Code §417(e)) to convert the Cash Balance Account back into an annuity.  See 2001 Plan at §5.02(d), (f), (g) (Ex. 1 p33).

96.     To calculate Nolan's Opening Account Balance, DTE present-valued Nolan's Traditional Plan Accrued Benefit (the age-65 annuity) using a 30-year Treasury rate of 5.48%.  2001 Plan at §5.02(d) (Ex. 1 p33).  Unfortunately for Nolan and others who made the Cash Balance choice, the 30-year Treasury rates and "applicable rates" under the Plan steadily decreased the entire time they participated in the Cash Balance Plan, thereby diminishing the annuity value of their Opening Account Balances, as well as the value of the annuity under the Cash Balance Plan derived from the Interest Credits and Contribution Credits added to their Cash Balance Accounts.

97.     Defendants' failure to disclose such interest rate risk defies explanation, as interest rates had commenced a downward trajectory at least eleven years before creation of the Cash Balance Plan.  See Decision Guide (Ex. 2 p37, listing 30-year Treasury rates from 1991 through 2001).

98.     The risk that benefits under the Cash Balance Plan might not grow for a significant period of time if interest rates continued to fall should have been disclosed to DTE employees offered the Cash Balance choice.

99.     Because of the declining variable interest rates under the Cash Balance Plan, converting Nolan's Opening Account balance ($59,932.23) back to an age-65 annuity at any time during her participation in the Cash Balance Plan, will always yield a smaller annuity than the $1,581.19/month she earned under the Traditional Plan.  Indeed, the value of Nolan's Traditional Plan Accrued Benefit decreased each year she participated in the Cash Balance Plan.  Therefore, even with the addition of Contribution Credits and Interest Credits, Nolan's benefit under the Cash Balance Plan was significantly less than the Accrued Benefit she earned under the Traditional Plan 15½ years earlier![8]

100.   The table below reflects computations by Nolan's actuary showing, at three different points in time over a 15-year period, the annuity that is the actuarial equivalent of Nolan's Opening Account Balance ("OAB"), as determined using the Plan's variable interest rates for making such actuarially equivalent conversions.

---

[8]  Under Ms. Sharp's representations to Nolan, Nolan's Cash Balance benefit was $987.83/month, or nearly $600/month less than her Traditional Plan Accrued Benefit. Under calculations by Nolan's actuary, Nolan's Cash Balance benefit was $402.55/month, or nearly $1,200/month less than her Traditional Plan Accrued Benefit.

| | |
|---|---|
| Nolan's age-65 Accrued Benefit under the Traditional Plan as of 5-31-2002 (the day before her transfer to the Cash Balance Plan) | $1,581.19[9] |
| actuarially equivalent annuity to OAB as of 12/31/2002 payable at age 65 | $1,287.56 |
| actuarially equivalent annuity to OAB as of 12/31/2012 payable at age 65 | $1,165.35 |
| actuarially equivalent annuity to OAB as of 12/01/2017 payable at age 65 | $878.76 |
| Actuarially equivalent annuity to OAB as of 12/01/2017 **payable at Nolan's actual retirement age of 59 years and 3 months** | $585.28[10] |

101.   As is evident from the foregoing, due to the downward trend in interest rates over this 15-year period, Nolan's Traditional Plan Accrued Benefit became worth less and less under the Cash Balance Plan.

---

[9]  This number was supplied by DTE.  See Nolan's Pension Calculation Statement from DTE (Ex. 4, p2 near the bottom).

[10]  When this age-59 Traditional Plan annuity is added to the age-59 Cash Balance annuity, the total equals $987.83/month (the amount Ms. Sharp represented to Nolan as the pension Nolan earned under the Cash Balance Plan), which is nearly $600 less than the "frozen and protected" Accrued Benefit Nolan earned under the Traditional Plan ($1581.19/month).   As explained in footnote 3, Nolan was entitled to this amount ($1,581.19) without any actuarial reduction for benefit commencement before age 65 because (i) under the Traditional Plan, Participants are entitled to receive the age-65 benefit as early as age 58 if they have at least 30 years of service, and (ii) Nolan had 38 years of service.   2001 Plan at §6.08 (Ex. 1 p 40).   While Class members with less than 30 years of service are not eligible for this subsidy, they are nevertheless eligible for the A+B Benefit under §6.01 of the 2001 Plan, and in accordance with the representations in the Decision Guide.

102.    Although Nolan was a long-service employee when she transferred to the Cash Balance Plan, the same pattern would result for a short-service DTE employee who accepted DTE's invitation and transferred to the Cash Balance Plan. That is, the Traditional Plan accrued benefit of a short-service employee would also continually decrease.

103.    The risk of this happening should have been disclosed in the Decision Guide.

104.    Moreover, DTE could have eliminated this risk if it had simply used a fixed Interest Credit rate and annuity conversion rate of at least 5.48%–the rate utilized to compute the initial Opening Account Balance.

105.    To summarize Nolan's ERISA §102 claim: The Decision Guide (the Plan's SMM) (i) communicates to the reader that, if you elect to transfer to the Cash Balance Plan, you will receive the "frozen and protected" benefit you earned under the Traditional Plan **plus** benefit accruals under the Cash Balance Plan; and (ii) does not disclose that DTE will use a "larger of" methodology to compute the pension at retirement, or that, under that methodology, a participant might earn no new benefits for a significant period of time, possibly years, or even never.

106.    Given these misleading statements and omissions, it is indisputable that the Decision Guide violates ERISA §102 and that, as a result, Nolan experienced significant financial harm.

*ERISA §204(h)*

107.    In her Appeal, Nolan added that DTE also violated ERISA §204(h), 29 U.S.C. §1054(h).

108.    Under ERISA §204(h), a notice from the plan administrator must be given to pension plan participants whenever a plan amendment significantly reduces the rate of future benefit accruals.  Appeal (Ex. 9 p12).

109.    As required by ERISA §204(h), the notice must be "written in a manner calculated to be understood by the average plan participant," provide "sufficient information" to allow participants to "understand the <u>effect</u> of the amendment," and be given "within a reasonable time <u>before</u> the effective date of the amendment." <u>Id</u>. quoting 29 U.S.C. §1054(h) (underline added).

110.    The statute further provides that if there is an "egregious failure" to meet any of these requirements, participants are entitled to the "greater of the benefits to which they would have been entitled without regard to the amendment" and "the benefits under the plan with regard to the amendment." <u>Id</u>.

111.    There is an "egregious failure" to meet an ERISA §204(h) requirement if the failure was within the plan sponsor's control and the plan administrator fails to provide most of the participants with most of the information they are entitled to receive under the statute.  <u>Id</u>.

112.   As Nolan explained in her Appeal, the 2001 Plan constituted a 204(h) amendment, as it (i) amended the former Prior Plan/Traditional Plan, and (ii) enabled DTE employees to elect to transfer from the Traditional Plan to the Cash Balance Plan.  See 2001 Plan at Cover Page, Preamble, and §2.75 and §5.02 (Ex. 1, cover, pp1, 14, 32).

113.   Because the "larger of" methodology DTE used to compute Nolan's pension at retirement resulted in Nolan earning no new pension benefits during the entire 15½ years she participated in the Cash Balance Plan, her effective rate of "future" benefit accrual was **zero**.  Appeal (Ex. 9 p13).

114.   Nolan rightfully complained in her Appeal that DTE never notified her of the "larger of" methodology or its potential reduction of her future pension accruals, much less before December 31, 2001 (the effective date of the 2001 Plan).  Id. citing 2001 Plan at §5.02(b) (Ex.1 p32).  See also Decision Guide (Ex. 2 p41).

115.   Nolan explained that DTE's failure to provide her with such notice was "egregious" because (i) at the time she elected to transfer to the Cash Balance Plan, DTE was both the plan Sponsor and Plan Administrator and had the right to designate the person or entity to act as the Plan Administrator [See 2001 Plan at §§2.19, 2.71, 2.72, 9.01 (Ex. 1 pp 7, 13, 79)], and (ii) given the lack of disclosure of the "larger of" methodology in the Decision Guide (the Plan's SMM) and its adverse impact on the rate of future benefit accruals, it could be assumed that DTE did not provide notice

of this to any other DTE Traditional Plan participant invited to transfer to the Cash Balance Plan, much less "most" such participants, as required under ERISA §204(h). Appeal (Ex. 9 p13).

116.   Invoking ERISA §204(h), Nolan revised her request for relief in her Appeal.  Appeal (Ex. 9 pp14-15).

117.   Specifically, Nolan requested that her pension be recomputed as the greater of (i) the benefit she would receive under the Plan before it was amended to add the Cash Balance Plan election option (i.e., the benefit under the Traditional Plan formula for all of her years of service with DTE), and (ii) the benefit under the Plan after it was amended to add the Cash Balance choice option (i.e., the benefit payable under the 2001 Plan). Id. p15.

118.   With respect to the latter, Nolan emphasized that the 2001 Plan must be interpreted consistent with (i) the A+B Benefit Promise for computing the Accrued Benefit articulated under §6.01 of the 2001 Plan, and (ii) the A+B Benefit representations DTE made in the Decision Guide and Ayco PPP.  Id.


The Final Denial

119.   On or about August 20, 2018, Nolan received the Appeals Committee's decision on her Appeal, which came by way of a letter signed by Michael S. Cooper on behalf of the Appeals Committee ("the Final Denial") (Ex. 12).

120.   The Final Denial (i) rejected Nolan's Claim for additional pension benefits <u>under the terms of the 2001 Plan,</u> (ii) all but ignored Nolan's Claims that she was also entitled to additional benefits based on DTE's violations of ERISA §§102 and 204(h); and (iii) advised Nolan that if she was dissatisfied with the decision she could sue, adding that, under ERISA §503, she could request copies of documents, records, and other information relevant to her claim.  <u>Id</u>.

<u>Nolan's Document and Information Request Following the Final Denial</u>

121.   On August 27, 2018, Nolan sent a letter to Cooper requesting (i) a copy of all documents the Appeals Committee <u>relied</u> upon, and (ii) other relevant documents and information (Ex. 14).

122.   One month later, Cooper sent a letter to Nolan ("the Post Denial Letter") (i) listing 24 documents the Appeals Committee <u>relied</u> upon in denying her Claim (producing the documents on a flash drive) and (ii) responding to Nolan's other document and information requests, but producing only some of the other documents requested (also on the flash drive).  <u>See</u> Post Denial Letter (Ex. 15).

123.   Twenty-two of the twenty-four documents Cooper listed as those the Appeals Committee relied upon were created <u>years</u> after DTE invited its employees in the Spring of 2002 to transfer to the Cash Balance Plan–the notable exceptions being the 2001 Plan and Decision Guide.  <u>Id</u>. at pp 2-3.  Eighteen of the twenty-four

documents the Appeals Committee relied upon are SPDs created in 2004 or later.  Id.

## Class Action Allegations

124.    Nolan brings her Claims on behalf of the following individuals ("the

Class"):

>    All DTE employees who, in 2002, elected to transfer from
>    DTE's Traditional Plan to DTE's Cash Balance Plan.

125.    The members of the Class are so numerous that joinder is impracticable.

126.    On information and belief, the Class exceeds one hundred members,

making joinder of all members impracticable.

127.    There exist questions of law common to all Class members, including,

without limitation, the following:

>    (i) Whether, under §6.01 of the 2001 Plan, DTE was
>    required to compute the Class members' benefits at
>    retirement as (A) the Accrued Benefit earned under the
>    Traditional Plan before the transfer **plus** (B) the Accrued
>    Benefit earned under the Cash Balance Plan after the
>    transfer.
>
>    (ii) Whether, in light of DTE's representations in the
>    Decision Guide and Ayco PPP, DTE was required to
>    compute the Class members' benefits at retirement  in
>    accordance with the formula set forth in the preceding
>    subparagraph.
>
>    (iii) Whether DTE was required to provide the Class
>    members with an ERISA §204(h) Notice advising that, if
>    they transferred to the Cash Balance Plan they would
>    experience a significant reduction in the rate of future
>    benefit accruals.

(iv) If DTE was required to provide the Class members with the foregoing ERISA §204(h) Notice, but failed to do so, whether DTE was required under ERISA §204(h) and its enforcing regulations to compute the Class members' benefits at retirement as the greater of (a) the benefit under the Plan <u>before</u> it was amended to add the Cash Balance Plan election provision set forth in §5.02(b) of the Plan, and (b) the benefit under the 2001 Plan <u>after</u> it was amended to add the Cash Balance Plan election provision set forth in §5.02(b) of the 2001 Plan.

128.    Nolan's Claims are typical of those of the other Class members, most

significantly because–

(i) Under §6.01 of the 2001 Plan, and as also represented by DTE in the Decision Guide (the SMM for the 2001 Plan) and Ayco PPP, all Class members were/are entitled to have their pension benefit at retirement computed as (A) the Accrued Benefit they earned under the Traditional Plan before the transfer **plus** (B) the Accrued Benefit they earned under the Cash Balance Plan after the transfer.

(ii) Under DTE's interpretation of the 2001 Plan, all Class members' benefits at retirement were or will be computed as the "larger of" the Accrued Benefit earned under the Traditional Plan before the transfer and the Accrued Benefit earned under the Cash Balance Plan after the transfer, rather than the sum of these two components as required under §6.01 of the 2001 Plan and as represented by DTE in the Decision Guide and Ayco PPP.

(iii) All Class members were provided the Decision Guide to "help" them make a decision as to whether to transfer to the Cash Balance Plan.

(iv) No Class member was provided an ERISA §204(h) Notice addressing the Cash Balance Plan election option before the effective date of the Plan amendment that added that option, which was December 31, 2001, the date the 2001 Plan was amended, restated and made effective.

(v) No Class member was provided an ERISA §204(h) Notice before being invited to transfer to the Cash Balance Plan.

(vi) No Class member was provided an ERISA §204(h) Notice before electing to transfer to the Cash Balance Plan.

(vii) No Class member was provided an ERISA §204(h) Notice before their election to transfer to the Cash Balance Plan became irrevocable.

129.   Nolan will fairly and adequately represent the members of the Class and protect their interests, as her interests are coincident with, and not antagonistic to, those of the other Class members.

130.   In addition, the attorneys for the proposed Class are experienced in ERISA pension plan class action litigation.

131.   Defendants have acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the Class as a whole.

132.   The questions of law common to the Class members predominate over any questions affecting only individual Class members.

133.   Litigating Nolan's Claims as a class action is superior to other available methods for fairly and efficiently adjudicating the controversy, in that the Class members injured by Defendants' conduct would not be compensated for their injuries in the absence of a class action as it would be too expensive for them to individually prosecute the Claims solely on their own behalf.

134.   Even if individual members of the Class could afford to prosecute the Claims alone, the Court would be inundated with myriad lawsuits involving identical issues.

135.   Individual litigation magnifies the delay and expense to all parties and to the court system of resolving the controversies engendered by Defendants' actions.

136.   By contrast, a class action presents fewer management difficulties and provides the benefits of unitary adjudication, economies of scale and comprehensive supervision by a single court.

137.   Lastly, the management of this class action will not be difficult, as little contact with individual Class members will be necessary; Defendants' conduct, and not that of the Class members, represents the primary issue in this litigation.

## Count I - Breach of the Terms of the Plan

138.    Nolan realleges and incorporates by reference the preceding paragraphs of this Complaint as though fully restated herein.

139.    Nolan brings this Count I under ERISA §502(a)(1)(B), 29 U.S.C. §1132(a)(1)(B), which states that a civil action my be brought by a participant or beneficiary [of an ERISA plan] to recover benefits due "under the terms of the plan," enforce rights "under the terms of the plan," or to clarify rights to future benefits "under the terms of the plan."

140.    Under this Count I, Nolan seeks benefits due under §6.01 of the 2001 Plan which enunciates a two-part formula for computing a Participant's Accrued Benefit under the Plan:

> **Section 6.01 Accrued Benefit.** Except as provided in the Citizens Appendix to this Plan, a Participant's Accrued Benefit shall be determined as follows:
>
> (a)    **Formula.**
>
> **(1) DTE and MCN Traditional Plan Participants.** *At any point in time*, a DTE or MCN Traditional Plan Participant's Accrued Benefit, payable in the Normal Form commencing on the Participant's Normal Retirement Date, shall be calculated in accordance with Sections 6.02 through 6.05, as applicable.
> **(2) DTE and MCN Cash Balance Plan.** *At any point in time*, a DTE or MCN Cash Balance Plan Participant's Accrued Benefit, payable in the Normal Form commencing on the Participant's Normal Retirement Date, shall be the Actuarial Equivalent of the Participant's Cash Balance Account, as described in Article V.

2001 Plan at §6.01 (italics added) (Ex. 1 p37).

141.    Therefore, if a Participant participated in both the Traditional Plan and Cash Balance Plan, the Participant's Accrued Benefit would equal (A) the pension the Participant earned under the Traditional Plan **plus** (B) the pension the Participant earned under the Cash Balance Plan.  Id. (The A+B Benefit Promise).

142.    Nolan participated in the Traditional Plan until June 1, 2002 when she became a participant in the Cash Balance Plan following her receipt of (i) an invitation from DTE to transfer to the Cash Balance Plan, and (ii) her exercise of that election option in March/April of 2002.

143.    As of May 31, 2002, the date immediately preceding her transfer to the Cash Balance Plan, Nolan had served DTE for 22½ years and earned an Accrued Benefit under the Traditional Plan in the amount of $1,581.19/month.

144.    When Nolan retired from DTE 15½ years later in December 2017 (after serving DTE for 38 years), she had also earned a pension under the Cash Balance Plan in the amount of $402.55/month (based on calculations from Nolan's actuary).

145.    Under the A+B Benefit Promise, Nolan's pension benefit *should* have equaled both of these amounts, or $1,983.74/month ($1,581.19/month Traditional Plan benefit + $402.55/month Cash Balance Plan benefit = $1,983.74/month).

146.    However, DTE paid Nolan only the "larger of" her Traditional Plan pension ($1,581.19/month) and Cash Balance Plan pension ($987.83/month

according to DTE), or $1,581.19/month--the same pension Nolan earned under the Traditional Plan <u>15½ year earlier</u>.

147.   This meant that, **for the entire 15½ years Nolan participated in the Cash Balance Plan, she effectively earned no new pension benefits.**

148.   Because DTE's "larger of" pension calculation methodology is contrary to the A+B Benefit Promise in §6.01 of the 2001 Plan and is nowhere found elsewhere in the 2001 Plan, Nolan asks the Court to issue an Order that–

(i) instructs Defendants to–

(A) compute her and the other Class members' pension benefits in accordance with §6.01 of the 2001 Plan, that is, as (A) the Accrued Benefit earned under the Traditional Plan before the transfer **plus** (B) the Accrued Benefit earned under the Cash Balance Plan after the transfer; and

(B) pay her and the other Class members any amounts owed under this computation methodology plus prejudgment interest on those amounts;

(ii) clarifies that any future benefits payable to the Class members (e.g., those who have not yet retired) must be computed and paid in accordance with the preceding subparagraphs;

(iii) instructs Defendants to pay all costs and attorneys' fees incurred in prosecuting the Claims brought in this lawsuit, as permitted under ERISA §502(g), 29 U.S.C. §1132(g); and

(iv) grants any other relief the Court deems appropriate and permissible under ERISA §502(a).

## Count II - Violation of ERISA §102

149.   Nolan realleges and incorporates by reference the preceding paragraphs of this Complaint as though fully restated herein.

150.   Pursuant to ERISA §502(a)(3), 29 U.S.C. §1132(a)(3), a participant or beneficiary may bring a civil action to "(A) to enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan."

151.   Nolan brings this Count II under both ERISA §502(a)(3) and ERISA §502(a)(1)(B).

152.   For purposes of this Count II, Nolan assumes that the 2001 Plan contemplates use of the "larger of" methodology DTE used to compute her pension at retirement.

153.   As explained below, Nolan and the other Class members are nevertheless entitled to additional pension benefits from the Plan on account of Defendants' violation of ERISA §102.

154.   In the Spring of 2002, DTE invited employees in its Traditional Plan to transfer to its new Cash Balance Plan.

155.   To "help" them decide whether to make that election, DTE provided them with the Decision Guide discussed *supra*, which, among other things, states that

it is a Summary of Material Modifications (SMM) for the Plan.  Decision Guide (Ex. 2, last page, unnumbered).

156.    Consistent with this representation, page 5 of the Decision Guide advises that it is the "primary source" of printed information about the Cash Balance Plan choice:

> Begin reviewing this Decision Guide.  It serves as your primary source of printed *Retirement Choice* information.

Decision Guide (Ex. 2 p5) (italics in original).

157.    Page 7 of the Decision Guide promises DTE employees who transfer to the Cash Balance Plan that, once they are vested, they <u>will</u> receive their "frozen and protected" Traditional Plan benefit:

> Once you are **vested**, you are eligible for the greater of any Traditional Pension Plan retirement benefits you have accrued as of December 31, 2001 or May 31, 2002, the dates on which <u>your Traditional Pension Plan benefit is frozen and protected</u>.

Decision Guide (Ex. 2 p7) (underline added).

158.    On pages 8 and 10, the Decision Guide further promises a benefit under the Cash Balance Plan and explains that the benefit will <u>increase</u> each year with "Contribution Credits" and "Interest Credits":

> <u>Your cash balance pension benefit increases each year with two types of credits</u>:
> - **Contribution credits** - Equal to 7% of your eligible earnings each year.
> - **Interest credits** - Based on average **30-year Treasury rates\*** for the month of September prior to the plan year. Interest on each year's January 1 benefit is added the following December 31. The interest credit does not apply to the contribution for the current year.

Decision Guide (Ex. 2 p8) (underline added).

> - Your cash balance pension benefit is expressed as a lump sum. <u>Your cash balance benefit increases each year</u> with:
> – **Contribution credits** - equal to 7% of your eligible earnings; and
>
> – **Interest credits** - based on average 30-year Treasury rates for the month of September prior to the plan year. Interest on each year's January 1 benefit is added the following December 31. The interest credit does not apply to the contribution for the current year.

Decision Guide (Ex. 2 p10) (underline added).

159. Most significantly, pages 20 through 24 of the Decision Guide contain <u>eight graphs</u> displaying how benefits accrue under the Traditional Plan and Cash Balance Plan (depending on various assumptions), <u>each showing steady and increasing pension accruals under the Cash Balance Plan</u>. Decision Guide (Ex. 2 pp 20-24).

160.   Collectively, the representations on pages 7, 8, 10, and 20-24 of the Decision Guide communicate a single consistent message:  If you transfer to the Cash Balance Plan, you will receive (A) your "frozen and protected" Traditional Plan benefit **plus** (B) a Cash Balance Plan benefit.

161.   This message was also communicated through DTE's agent, Ayco, in a Power Point Presentation (PPP) Ayco gave during the two-month election period, which included numerous charts and graphs representing that employees who transfer to the Cash Balance Plan <u>will</u> receive steady and increasing pension accruals under the Cash Balance Plan.  Ayco PPP (Ex. 11 pp18, 19, and 23 thru 26).

162.   Neither the Decision Guide (Ex. 2) nor Ayco's PPP (Ex. 11) states that if a Participant elects to transfer to the Cash Balance Plan, the Participant will receive only the "larger of" the pension earned under the Traditional Plan or Cash Balance Plan, or that the Participant might earn no new benefits for a significant period of time after the election, possibly years, or even never.

163.   Moreover, DTE reaffirmed its message again on March 31, 2005 when Geri Schmidtzinsky, Project Manager for DTE's <u>Retirement</u> Service Center, sent Nolan a letter stating that, in addition to her Cash Balance Plan benefits, she might be eligible for "additional benefits" under a "prior plan" if she was a transferred employee:

> Please find enclosed the 2004 Cash Balance Statement.
> This statement reflects the benefits under the New Horizon
> Cash Balance Plan only.   <u>You may be eligible for
> additional benefits under a prior plan if you are a
> transferred employee</u>.

Schmidtzinsky Letter to Nolan, 3-31-2005 (Ex. 10) (underline added).

164.    In the Final Denial on Nolan's Claims, DTE asserted that Schmidtzinsky sent this letter to all Cash Balance Plan participants.   Therefore, Schmidtzinsky necessarily sent the letter to all Class members.

165.    The significance of Schmidtzinsky's letter is two-fold:  One, it shows that DTE's own Project Manager for <u>retirement benefits</u> believed persons who transferred from the prior Traditional Plan to the Cash Balance Plan were entitled to benefits earned under both Plans.

166.    Two, it reaffirmed to Nolan and the other Class members that, when they retired, they would receive (A) the pension they earned under the Traditional Plan **plus** (B) the pension they earned under the Cash Balance Plan.

167.    Pursuant to ERISA §102 (29 U.S.C. §1022), plans must state their manner of operation in clear and understandable terms in a summary plan description (SPD) and in any summary of material modifications (SMM) to the terms of the plan, both of which must be furnished to the plan's participants.

168.    The SPD and SMM must be "written in a manner calculated to be understood by the average plan participant, and <u>shall</u> be sufficiently accurate and comprehensive to reasonably apprise such participants of their rights and obligations under the plan." Id. (underline added).

169.    Section 102 further dictates that the SPD and SMM must include the "circumstances which may result in disqualification, ineligibility, or denial or loss of benefits." Id.

170.    In fulfilling these SPD and SMM requirements, DOL regulations emphasize that plan administrators must take into account the complexity of the plan and the average participant's level of comprehension, and should usually use clarifying examples and illustrations and avoid using technical jargon. 29 CFR §2520.102-2(a).

171.    If there will be any loss or denial of benefits, the SPD or SMM must clearly identify the circumstances that might bring that about. 29 CFR Section 2520-102-3(l).

172.    Additionally, the DOL regulations mandate that <u>the SPD or SMM must not have the effect of misleading, misinforming, or failing to inform participants</u>. 29 CFR §2520.102-2(b).

173.    In light of the (i) length and complexity of the 2001 Plan, (ii) profound differences between the Traditional Plan and Cash Balance Plan concerning benefit accruals, and (iii) devaluation of the "protected" Traditional Plan benefit under the Cash Balance Plan if interest rates continued to fall (they did), strict adherence to the disclosure and related obligations imposed by ERISA §102 became paramount.

174.    The 2001 Plan is 167 pages in length and, as Nolan noted in her administrative Appeal, is "enormously complex."  Appeal (Ex. 9 p6).

175.    Unfortunately for Nolan and the other Class members, the Decision Guide failed miserably to comply with ERISA §102's disclosure requirements, as it nowhere states that if you elect to transfer to the Cash Balance Plan, you will receive only the "larger of" the pension earned under the Traditional Plan and Cash Balance Plan, or that you might earn no new benefits for a significant period of time after the transfer, possibly years, or even never (Nolan's situation).

176.    Likewise, the Decision Guide provides no illustrative examples showing that, under the "larger of" methodology, the Participant will necessarily forfeit his/her Traditional Plan benefit or Cash Balance benefit because, under DTE's "larger of" methodology, a Participant cannot receive both.

177.    Nolan's illustrative examples on pages 3 and 4 of this Complaint demonstrate how easy it would have been for DTE to clearly communicate all of this information in the Decision Guide (the SMM for the 2001 Plan).

178.   DTE's failure to disclose in the Decision Guide that it intended to use a "larger of" methodology to compute the pension benefit at retirement constituted an obvious violation of ERISA §102.  That violation was magnified by the Ayco PPP which, as noted, included numerous charts and graphs representing that employees who transferred to the Cash Balance Plan <u>would</u> receive steady and increasing pension accruals under the Cash Balance Plan [(Ex. 11 pp18, 19, and 23 thru 26)], but nowhere stated that, at retirement, they would receive only the "larger of" the pension earned under the Traditional Plan or Cash Balance Plan, or that they might earn no new benefits for a significant period of time after the transfer, possibly years, or even never.

179.   Given that DTE plainly violated the disclosure requirements under ERISA §102 by failing to provide this highly material information in the Decision Guide (the SMM for the 2001 Plan), Nolan asks this Court to issue an Order that–

(i) <u>equitably reforms the 2001 Plan</u>, as permitted under ERISA §502(a)(3), so that it is consistent with the Decision Guide's representations that DTE employees who transfer to the Cash Balance Plan will receive (A) the Accrued Benefit earned under the Traditional Plan before the transfer **plus** (B) the Accrued Benefit earned under the Cash Balance Plan after the transfer; and

(ii) after the reformation, under ERISA §502(a)(1)(B), instructs Defendants to–

(A) compute Nolan's and the other Class members' pensions consistent with the reformed 2001 Plan; and

(B) pay Nolan and the other Class members any pension amounts owed under the reformed 2001 Plan, including prejudgment interest on those

amounts;

(iii) clarifies that any future benefits payable to Class members (e.g., those who have not yet retired) must be computed consistent with the reformed 2001 Plan;

(iv) instructs Defendants to pay all post-judgment interest required under 28 U.S.C. §1961;

(v) instructs Defendants to pay all costs and attorneys' fees incurred in prosecuting the Claims brought in this lawsuit, as permitted under ERISA §502(g), 29 U.S.C. §1132(g); and

(vi) grants any other relief the Court deems appropriate and permissible under ERISA §502(a).

180.   If the 2001 Plan is not reformed, Nolan requests that the Court issue an order–

(i) equitably surcharging Defendants for all pension losses she and the other Class members suffered on account of DTE's violation of ERISA §102, as permitted under ERISA §502(a)(3), including prejudgment interest on those losses and post judgment interest as required under 28 U.S.C. §1961;

(ii) instructing Defendants to pay all costs and attorneys' fees incurred in prosecuting the Claims brought in this lawsuit, as permitted under ERISA §502(g); and

(iii) providing for any other relief the Court deems appropriate and permissible under ERISA §502(a).

## Count III - Violation of ERISA §204(h)

181.   Nolan realleges and incorporates by reference the preceding paragraphs of this Complaint as though fully restated herein.

182.   Nolan brings this Count III under <u>both</u> ERISA §502(a)(1)(B) and ERISA §502(a)(3).

183.   Under ERISA §204(h), a notice must be furnished to pension plan participants whenever a plan amendment provides for a significant reduction in the rate of future benefit accruals.  29 U.S.C. §1054(h).

184.   The statute requires that the notice be provided by the plan administrator, be "written in a manner calculated to be understood by the average plan participant," provide "sufficient information" to allow participants to "understand the <u>effect</u> of the amendment," and be given "within a reasonable time <u>before</u> the effective date of the amendment."  <u>Id</u>. (underline added).

185.   The statute mandates that if there is an "egregious failure" to meet <u>any</u> of these requirements, participants are entitled to the "greater of the benefits to which they would have been entitled without regard to the amendment" and "the benefits under the plan with regard to the amendment."  <u>Id</u>.

186.   There is an "egregious failure" to meet an ERISA §204(h) requirement if the failure was within the plan sponsor's control and the plan administrator failed to provide most of the participants with most of the information they are entitled to receive under the statute.  <u>Id</u>.

187.   As discussed, the 2001 Plan constituted a 204(h) amendment because it (i) amended the former Prior Plan/Traditional Plan, and (ii) enabled DTE employees

in the Traditional Plan to choose the Cash Balance Plan.  See 2001 plan at Cover Page, Preamble, and §2.75 and §5.02 (Ex. 1, cover, pp1, 14, 32).

188.   Under the "larger of" methodology DTE used to compute Nolan's pension at retirement, Nolan earned no new pension benefits during the entire 15½ years she participated in the Cash Balance Plan.

189.   Therefore, for the entire 15½ years Nolan participated in the Cash Balance Plan, her rate of "future" benefit accrual was **zero**.

190.   Under DTE's "larger of" methodology, all Class members experienced a significant reduction in the rate of future benefit accrual after they transferred to the Cash Balance Plan with some accruing no new pension benefits for a period of time after the transfer (i.e., a zero rate of benefit accrual for that period).

191.   However, no Class member was ever provided with a notice that DTE intended to use a "larger of" methodology to compute their pension at retirement, much less an explanation of the adverse impact that methodology would have on their future pension accruals and ultimate pension amount.

192.   DTE's failure to provide such notice to the DTE employees offered the Cash Balance choice was "egregious" because, at the time, DTE was both the plan Sponsor and Plan Administrator and was empowered to designate the person or entity to act as the Plan Administrator and deliver the ERISA §204(h) Notice.  See 2001 Plan at §§2.19, 2.71, 2.72, 9.01 (Ex. 1 pp 7, 13, 79).

193.   <u>ERISA §204(h) dictates the applicable "terms of the plan" when there has been an egregious failure to provide the ERISA §204(h) Notice</u>.

194.   Here, those applicable terms are the greater of--

(i) the benefit payable under the Plan before it was amended to offer DTE employees the option of electing to transfer from the Traditional Plan to the Cash Balance Plan, i.e., the benefit payable under the Traditional Plan formula, and

(ii) the benefit payable under the 2001 Plan.

195.   Because ERISA §204(h) dictates the "terms of the plan" when the required ERISA §204(h) Notice has not been provided, Nolan requests that the Court issue an order, as permitted under ERISA §502(a)(1)(B), that–

(i) instructs Defendants to compute her and the other Class members' pension benefits in accordance with the pension calculation methodology set forth in the preceding paragraph;

(ii) instructs Defendants to pay her and the other Class members any amounts owed under the pension calculation methodology set forth in the preceding paragraph, including prejudgment interest on those amounts; and

(iii) clarifies that any future benefits payable to the Class members (e.g., those who have not yet retired) must be computed and paid in accordance with the pension calculation methodology set forth in the preceding paragraph.

196.   Nolan further requests that the Court--

(i) order Defendants to pay post-judgment interest required under 28 U.S.C. §1961, and all costs and attorneys' fees incurred in prosecuting the Claims brought in this lawsuit, as permitted under ERISA §502(g), 29 U.S.C. §1132(g); and

(ii) grant any other relief the Court deems appropriate and permissible under ERISA §502(a).

197.    To the extent the "terms of the plan" dictated under ERISA §204(h)

constitute equitable reformation, Nolan asks the Court to–

(i) equitably reform the 2001 Plan in accordance with ¶194, as permitted under ERISA §502(a)(3);

(ii) under the equitably reformed 2001 Plan, grant the relief requested under paragraph 197, including prejudgment interest;

(iii) order Defendants to pay post-judgment interest required under 28 U.S.C. §1961, and all costs and attorneys' fees incurred in prosecuting the Claims brought in this lawsuit, as permitted under ERISA §502(g), 29 U.S.C. §1132(g); and

(iv) grant any other relief the Court deems appropriate and permissible under ERISA §502(a).

Respectfully submitted October 26, 2018

s/s Eva T. Cantarella
Eva T. Cantarella (P51917)
Bradley J. Schram (P26337)
Robert P. Geller (P34391)
Patricia A. Stamler (P35905)
Hertz Schram PC
1760 S. Telegraph Rd., Ste. 300
Bloomfield Hills, MI 48302
*Attorneys for the Class*
o. 248-335-5000; f. 248-335-3346
ecantarella@hertzschram.com