UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LESLIE D. NOLAN,

                Plaintiff,                                Case Number 18-13359

v.                                               Honorable David M. Lawson

DETROIT EDISON COMPANY, DTE ENERGY
CORPORATE SERVICES, LLC, DTE ENERGY
COMPANY RETIREMENT PLAN, DTE ENERGY
BENEFIT PLAN ADMINISTRATION COMMITTEE,
JANET POSLER, QUALIFIED PLAN APPEALS
COMMITTEE, MICHAEL S. COOPER, RENEE MORAN
and JEROME HOOPER,

                Defendants.

_____/

## OPINION AND ORDER GRANTING MOTION TO DISMISS
## AND DISMISSING COMPLAINT

        In 2002, the Detroit Edison Company and its affiliated companies (DTE) implemented a

new retirement plan. Up to that point, DTE offered its employees a traditional defined benefit plan

(the Employees' Retirement Plan of the Detroit Edison Company, or "Traditional Plan"), wherein

a retired employee would be paid an annuity calculated on a formula based on the employee's

salary and years in service. The new plan is known as a "Cash Balance Plan," which has been

described as a species of defined benefit plan, but also as "a hybrid between a defined contribution

plan and a defined benefit plan as it contains attributes of both." *Register v. PNC Financial Servs.*

*Group, Inc.*, 477 F.3d 56, 62 (3rd Cir. 2007). Under the Cash Balance Plan, the company

established a hypothetical retirement account for each employee, which would grow from two

sources: annual "contribution credits" (equal to a percentage of the participant's eligible earnings),

and "interest credits" (initially linked to the interest rate of government-issued Treasury Bonds).

When DTE made the change, it did not require existing employees who had earned benefits under the old plan to switch to the new plan. Instead, it provided a window for those employees to elect to stay with the Traditional Plan or opt in to the new one, thereby allowing them to receive future retirement benefits under one plan or the other, but not both. That choice carried some measure of risk, because no certain prediction could be made that at retirement time an individual employee would do better under the new plan than the old one.

There was a further catch. Existing employees who elected to switch to the new Cash Balance Plan would have their accrued retirement benefits frozen and then receive a hypothetical retirement account balance based on what they had accrued already under the Traditional Plan, projected forward to their retirement date, and then reduced to present value. That established their opening cash balance, against which future accruals would be measured. In one way, that benefited them. It provided a guarantee that no matter how slowly their cash balance account grew compared to the opening balance, they would be guaranteed the monthly benefit upon retirement they had earned as of the date the account was frozen, and no less. Indeed, ERISA requires as much. *See* 29 U.S.C. § 1054(g). But their cash balance account would not grow beyond that initial balance until their accumulated credits caught up to that initial balance, "a phenomenon known in pension jargon as 'wear away.'" *Cigna Corp. v. Amara*, 563 U.S. 421, 431 (2011).

Plaintiff Leslie Nolan elected to switch to the Cash Balance Plan in the spring of 2002, after she had worked at DTE for just over 23 years. When she went to retire in 2017 after 38 years with the company, she was unpleasantly surprised to learn that her pension benefit had not grown much since her account was frozen in 2002. She believed that she should receive a monthly benefit as calculated under the Traditional Plan *plus* the amount accrued under the Cash Balance Plan since 2002, irrespective of the wear away. She sued the defendants under various sections of the

Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1001, *et seq.*, alleging that they breached the terms of the retirement plan, they failed to explain the election in terms that could be understood by the average person, and they failed to give notice that the new plan could result in a reduction of accrued benefits. The defendants responded to the complaint with a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6).

The Court heard oral argument on May 8, 2019. The materials furnished by the defendants to their employees in 2002 plainly state that a retiree electing to switch to the Cash Balance Plan would receive the "greater of" the accrued benefit under the traditional plan or under the Cash Balance Plan, but not both. The defendants did not breach the plan when calculating the plaintiff's monthly pension payment upon her retirement. And the plan materials provided notice that benefits under the new plan could be less, using language that could be understood by the average person. Moreover, all of the plaintiff's claims are time-barred. Because the plaintiff has not stated a claim for which relief can be granted, the Court will grant the defendants' motion and dismiss the complaint.

## I.

The following facts are taken from the complaint, the attached documents to it, and the materials referenced in the complaint.

Leslie Nolan began working for DTE on December 17, 1979. She remained at DTE for 38 years — most recently in the role of financial analyst — until her retirement on December 17, 2017. During her employment, Nolan participated in the two pension plans mentioned above, which are sponsored and administered by DTE and the DTE Energy Benefit Plan Administration Committee.

Nolan initially participated in the Traditional Plan, which became effective April 1, 1943. That was a defined benefit pension plan that computed an employee's retirement benefit as a percentage of average salary multiplied by years of service. The benefits under the Traditional Plan were paid as an annuity on a monthly basis.

Between March 4, 2002 and April 26, 2002, DTE invited eligible employees who participated in the Traditional Plan to transfer to its new retirement program, the Cash Balance Plan. The plaintiff alleges that with its invitation, DTE promised employees that if they elected to transfer to the new plan, they would receive both the "frozen and protected" pension benefit they previously earned under the Traditional Plan plus the benefit they would earn thereafter under the Cash Balance Plan ("A+B Promise"). Transferring to the Cash Balance Plan was voluntary and required affirmative action; otherwise an employee remained in the Traditional Plan.

Nolan elected to transfer to the Cash Balance Plan. In 2017, because of her age and length of service, she was eligible to retire before she reached age 65 without any reductions in benefits. But she learned then that her cash balance account had not grown — mostly due to her reduced salary when she went to part-time status and sharply declining interest rates — and she had not "caught up" to her frozen account balance under the Traditional Plan. Plainly she would have been better off had she stuck with the Traditional Plan.

Nolan contends that she is entitled to a pension based on the A+B formula, and if not, she was misled when the elections were presented to her in 2002. DTE says that the new plan contains no such formula, and employees were fully informed about the options, including the uncertainty of future outcomes, and that the employees were counseled through at least four resources in making their decisions: the Retirement Choice Decision Guide ("Decision Guide"), a personalized statement of their accrued benefits and the projected conversion to an opening cash balance, an

online modeling tool, and in-person workshops and webcasts presented by an outside financial counselor. According to the plaintiff, DTE expressed the A+B Promise in both section 6.01 of the Retirement Plan and the Decision Guide that also was furnished to eligible employees.

DTE's Retirement Plans

Article V of the revised Retirement Plan described the Cash Balance Plan, which if an employee elected became effective on June 1, 2002. A "Cash Balance Account" would be maintained for each employee who elected to participate in the Cash Balance Plan. The Account was described as "a hypothetical account used for bookkeeping purposes only to determine the amount of a Participant's retirement benefits that are payable pursuant to Article VI." Art. V, § 5.01, ECF No. 1-2, PageID.94. For those participants who transferred from the Traditional Plan, the hypothetical account would reflect an "Opening Cash Balance" equal to the actuarial equivalent of the participant's "accrued benefit" under the Traditional Plan as of the date of transfer. *Id.*, § 5.02(d), PageID.95. The accrued benefit would be converted into a lump sum using the applicable mortality table and interest rates. *Ibid.* Thereafter, annual "contribution credits" equal to a percentage of the participant's eligible earnings as well as "interest credits" then would accrue on the hypothetical account. *Id.*, § 5.02(e), (f), PageID.95.

The Retirement Plan defined "accrued benefit" as "the benefit that a Participant has earned under the Plan on any given date, without regard to the Participant's nonforfeitable right to such benefit, and computed in accordance with the applicable Accrued Benefit formulas in Article VI." Art. 2, § 2.01, ECF No. 1-2, PageID.65.

Section 6.01 sets forth the formula by which a participant's accrued benefit would be determined:

(1)    DTE and MCN Traditional Plan Participants. At any point in time, a DTE or MCN Traditional Plan Participant's Accrued Benefit, payable in the Normal

-5-

Form commencing on the Participant's Normal Retirement Date, shall be calculated in accordance with Sections 6.02 through 6.05, as applicable.

(2)　　DTE and MCN Cash Balance Plan.　At any point in time, a DTE or MCN Cash Balance Plan Participant's Accrued Benefit, payable in the Normal Form commencing on the Participant's Normal Retirement Date, shall be the Actuarial Equivalent of the Participant's Cash Balance Account, as described in Article V.

*Id.*, PageID.99.　Section 6.02 states that "[a] Participant shall have a fully vested right to a Normal

Retirement Benefit upon attainment of Normal Retirement Age, which shall be age 65." *Ibid.*

Section 6.03 defines the amount of a Cash Balance Plan participant's Normal Retirement Benefit

as "equal to the Participant's Accrued Benefit computed as of the Participant's Normal Retirement

Date." *Ibid.*　Section 6.04 defines the amount of a DTE Traditional Plan participant's Normal

Retirement Benefit as a percentage of the participant's average final compensation multiplied by

years of service with a minimum benefit of a fixed amount multiplied by years of service. *Id.*,

PageID.100.　Section 6.05 pertains to benefits accrued under the traditional plan of MCN Energy

Group, one of DTE's merger partners, which does not impact the issues in this case.

Decision Guide

DTE employees considering switching to the Cash Balance Plan were provided a 46-page

Decision Guide summarizing a three-step process for choosing a plan:

1. Educate – Learn about your options and how they work.

2. Evaluate – After educating yourself about your options, evaluate them according to your individual situation. With the modeling tool available through the *Retirement Choice* Web Site, evaluate and compare the retirement options using data from your Personalized Statement and by entering your own assumptions.

3. Elect – Once you have finished reading this Decision Guide and exploring the other resources available to you, you will need to visit the *Retirement Choice* Web Site to elect the option that is best for you.

Decision Guide at 1, ECF No. 1-3, PageID.224.　Although the Decision Guide was promoted as

employees' "primary source of printed *Retirement Choice* information," DTE also provided access

-6-

to the other resources mentioned above, including a "*Retirement Choice* Personalized Statement" that provided an overview of how an employee's pension benefit was calculated at the time and how it would convert under the Cash Balance Plan, as well as "*Retirement Choice* Workshops" presented by an independent consulting firm. *Id.*, PageID.227-28.

The first page of the "Educate" section of the Decision Guide provided a summary of what would happen to retirement benefits if an employee elected to continue with the Traditional Plan versus switching to the New Horizon Plan (Cash Balance Plan). *Id.*, PageID.230. Under the former, there would be no change to the formula of the pension plan as the employee would continue to receive a pension benefit based on average annual eligible earnings and years of benefit service. *Ibid.* Under the latter, the Decision Guide expressly noted,

- As of December 31, 2001, you will stop earning benefits under the Detroit Edison Traditional Pension Plan and begin earning benefits under the New Horizon Pension Plan.

- Your **accrued benefit** from the Traditional Plan will be converted using a **present value conversion factor** into an initial cash balance benefit for January 1, 2002 based on the lump-sum value of your accrued benefit under the Traditional Pension Plan on December 31, 2001.

- Your election will be used only if you continue to meet the eligibility requirements listed on page 3 until at least June 1, 2002, when your election becomes effective. Benefits as of January 1, 2002 will be based on your election.

- Once you are **vested**, you are eligible for the greater of any Traditional Pension Plan retirement benefits you have accrued as of December 31, 2001 or May 31, 2002, the dates on which your Traditional Pension Plan benefit is frozen and protected.

*Ibid.*

The following page presented the formulas for calculating retirement benefits under the Traditional Plan and the Cash Balance Plan. The Decision Guide explained that under the Traditional Plan, the retirement benefit was based on average salary and years of service, and that

the employee "do[es] not contribute to this plan. The Company fully pays for your benefits under the plan." It went on to state,

> Your cash balance pension benefit increases each year with two types of credits:
>
> - *Contribution credits* – Equal to 7% of your eligible earnings each year.
>
> - *Interest Credits* – Based on average *30-year Treasury rates** for the month of September prior to the plan year.
>
>   *Interest Credit Update: The U.S. Department of the Treasury has announced that it will stop issuing 30-year Treasury bonds in 2002, but it may continue to publish a 30-year Treasury rate. This rate is used under ERISA for pension funding and benefit calculations. If the Treasury stops publishing the 30-year Treasury rate, Congress will have to amend ERISA to replace the 30-year Treasury rate with a comparable measure. The pension plan will automatically change with the law. If this occurs, the change under ERISA will affect both the cash balance interest credits and the value of your Traditional Pension Plan benefit.

*Id.*, PageID.231.

The next page stated that if an employee chose the Cash Balance Plan, her "age 65 accrued benefit under [the] Traditional Pension Plan as of December 31, 2001 would be converted to an initial cash balance benefit in the [Cash Balance Plan] on January 1, 2002." *Id.*, PageID.232. The Decision Guide explained that because an employee's pension benefit under the two plans is expressed differently — a monthly amount under the Traditional Plan and a one lump-sum amount at present value under the Cash Balance Plan — the "current monthly annuity benefit under the Traditional Pension Plan will need to be converted to a total lump-sum amount in today's dollars by multiplying it by a present value conversion factor based on [the employee's] age as of January 1, 2002." *Ibid.* It went on to say that the "initial cash balance benefit in the [Cash Balance Plan] is determined by multiplying [the employee's] monthly age 65 current Traditional Plan benefit accrued through December 31, 2001 by [the] present value conversion factor." *Ibid.* It also noted that the "interest rate used for the initial cash balance benefit is 5.48%, which is the average 30-

year Treasury rate for September 2001," and that the table of all the present value conversion factors used to determine lump-sum payments under qualified pension plans was included in the package provided to eligible employees. *Ibid.*

The pages that followed included additional information about the two plans, including a side-by-side comparison. *Id.*, PageID.233. In describing how an employee's benefit grows under the Cash Balance Plan, the Decision Guide repeated that the cash balance benefit increases each year with contribution credits and interest credits. *Ibid.* In the adjacent column it repeated the formula for computing one's benefits under the Traditional Plan, explaining that the monthly accrued benefit equals a percentage of annual eligible earnings multiplied by years of service. *Ibid.*

The Decision Guide also encouraged employees to "Evaluate" their options, including by viewing "online retirement benefits projections through examples" and learning "how using different assumptions and scenarios with the modeling tool on the Retirement Choice Web Site will impact how [their] benefits are projected" under the two plans. *Id.*, PageID.242. The Decision Guide provided four hypothetical examples to assist in understanding how the plans compare for sample employees. Based on the limited information about the plaintiff stated in the complaint, it appears that sample employee "Terry" most closely resembles the plaintiff.

The hypotheticals used various personal data inputs, including age, average monthly eligible earnings, years of service, accrued monthly pension, and initial cash benefit, as well as several assumptions, including long-term average annual compensation growth, future cash balance interest credits, and retirement age. *Ibid.* The projected value of benefits at retirement age for each example were reflected on two charts, varying the assumption for future cash balance interest credits from 6% in the first chart to 8% in the second chart. *Id.*, PageID.244. Depending on the personal data inputs and assumptions used for each sample employee, the projected value

of benefits could be higher or lower under the Cash Balance Plan than under the Traditional Plan as the employee approached retirement age. *See id.*, PageID.244-247. For "Terry," there was no advantage to switching to the Cash Balance Plan under the 8% assumption, and there was a distinct disadvantage under the 6% assumption.

The Decision Guide instructed employees to use the online modeling tool to input their own data and assumptions to model scenarios and project potential benefits. *Id.*, PageID.248. It also noted that an employee's actual benefits would depend on changes in pay, years of service, changes in the interest rates for the pension plan, and investment returns. *Id.*, PageID.253. On a page titled, "How Do the Assumptions I Enter Impact My Benefit Projections?" the Decision Guide explained that increasing the "future cash balance interest credits" assumption will result in "a higher estimated benefit under the [Cash Balance Plan]." *Id.*, PageID.251. "Decreasing this assumption will decrease your projected benefits under this plan." *Ibid.*

On another page titled, "What Should I Keep in Mind as I Review All of My Modeler Results?", the Decision Guide stated, among other things:

> The pension benefit you earned at conversion under the Traditional Pension Plan is protected under the [Cash Balance Plan]. Although the [Cash Balance Plan] grows at a steady rate, do you find the [Cash Balance Benefit] does not catch up to the frozen accrued benefit under your Traditional Pension Plan for a number of years? If this happens and you are planning to leave DTE Energy during this time, your pension benefit may not grow.

> Do you notice more than one crossover point? Which benefit is better if you expect to leave DTE Energy at an age before or after each of the crossover points?

*Id.*, PageID.254. The following page cautioned,

> If you are close to early retirement age . . . You may notice that while the cash balance benefit in the [Cash Balance Plan] is growing at a steady rate, it may take a number of years before the cash balance benefit becomes greater than the value of your December 31, 2001 or May 31, 2002 accrued benefit under the Traditional Pension Plan. This may happen as you become eligible for early retirement benefits

under the Traditional Pension Plan, because the value of your early retirement factors were not included in your initial cash balance benefit.

If you choose the [Cash Balance Plan], effective on June 1, 2002, your Traditional Pension Plan benefit on May 31, 2002 is frozen and protected. Therefore, the value of your [Cash Balance Plan] benefit will never be less than the greater of the benefit you had on December 31, 2002 or May 31, 2002 under the Traditional Pension Plan.

*Id.*, PageID.255.

The Decision Guide concluded with information on how to elect a pension plan, deadlines to remember, and a glossary of key terms mentioned throughout the Decision Guide. Among the terms defined was "30-Year Treasury Rates," which referenced a chart in the adjacent column displaying average Treasury rates for the month of September for each of the last 10 years and indicating that "the Treasury rate has fluctuated over the years – a point you may want to consider when modeling your assumptions." *Id.*, PageID.260. Although the chart showed that the average 30-year Treasury rate in 1991 was 7.95%, that rate steadily had declined over the years. Mostly recently, it had dropped from 6.07% in 1999 to 5.48% in 2001. *Ibid.*

The last page of content, preceded by three blank pages on which to take notes, notified that the Decision Guide is a "Summary of Material Modifications" of DTE's retirement benefits programs, that DTE reserves the right to change its retirement plans at its discretion, and that legal documents supersede any information presented within the Decision Guide. *Id.*, PageID.268. It also included text box stating the following:

NOTICE OF POTENTIAL ADVERSE IMPACT ON FUTURE BENEFIT ACCRUALS

When making your decision between the Traditional Plans and the [Cash Balance Plans], you need to keep in mind that the cash balance pension formula in the [Cash Balance Plan] impacts individuals differently depending on a combination of service, age and other circumstances. It is important that you use the modeler that is provided to determine if your future pension accruals could be reduced or otherwise adversely impacted under the [Cash Balance Plan] formula. If you elect

the [Cash Balance Plan], the greater of your December 31, 2001 or your May 31, 2002 accrued benefit under the Traditional Pension Plan will be frozen, and you will never receive a [Cash Balance Plan] benefit that is less than the actuarial equivalent of your protected Traditional Pension Plan benefit on December 31, 2001 or May 31, 2002. However, due to the application of the cash balance formula in the [Cash Balance Plan], it is possible that your benefit will not grow initially or may grow at a slower rate than under the Traditional Pension Plan.

*Id.*, PageID.268.

### Financial Planning Seminar

In addition to the Retirement Plan and Decision Guide, DTE made available a financial planning seminar presented by The Ayco Company, L.P. ("Ayco"), the independent consulting firm that DTE had hired. Although it is not clear from the complaint whether Nolan attended the seminar in person, she possessed a copy of the Power Point presentation that was used during the seminar. Ayco Power Point, ECF No. 3-10. The presentation repeated and summarized the information provided in the Decision Guide, including the four hypothetical examples for sample employees with varying assumptions. *Id.*, PageID.348.

Before addressing the hypotheticals, the presentation highlighted the "Impact of Future Interest Rates on Your Modeling Results," explaining that a selected interest rate impacts the "Cash Balance Plan annual interest credit and guaranteed monthly income from annuity option" and "the [p]resent value of Traditional Pension Plan monthly benefit included in total value comparison." *Id.*, PageID.352. As illustrated in the Decision Guide, depending on the interest rate and assumptions used, a sample employee's projected benefit growth under the Cash Balance Plan at times was outpaced by the projected growth under the Traditional Plan. *Id.*, PageID.353. The presentation also included a graph of interest rate history dating back to 1991, illustrating both the 30-year Treasury Bond rate and Consumer Price Index (CPI). *Id.*, PageID.357.

Nolan's Retirement Benefits

Nolan elected to transfer to the Cash Balance Plan during the offer period. At the time, she was 43 years-old and had 22.5 years of service with DTE. In the years following her election, the 30-year Treasury Bond rates and other applicable rates under the Retirement Plan steadily decreased.

In September 2017, at age 59 and shortly before her planned retirement date, Nolan received a four-page "Pension Calculation Statement" (PCS) from DTE that included her payment options and the pension she would receive under each option if she retired on December 2, 2017. The PCS listed several figures, including Nolan's minimum accrued benefit earned as of December 31, 2001 and May 31, 2002. According to the statement, Nolan's minimum accrued benefit on May 31, 2002 (the greater of the two) was $1,581.19.

Because the PCS included numerous undefined terms that Nolan did not understand and lacked an explanation as to how her pension benefit amounts were calculated, on October 14, 2017, Nolan sent a letter to the Plan Administrator seeking (i) clarification of the undefined terms in the PCS and the methodology used to determine her pension amounts, (ii) copies of the Retirement Plan (both before and after she transitioned to the Cash Balance Plan), and (iii) copies of the Retirement Plan's summary plan descriptions (SPD).

On November 6, 2011, Nolan received a letter from Emily Sharp, DTE's Supervisor of Retirement Income Benefits, in response to Nolan's document and information request. The letter responded to each of Nolan's requests, answering that a copy of the applicable document had been provided with the letter or why no responsive document existed and explaining how the amounts listed on the PCS were computed. Although the complaint alleges that Sharp did not provide any SPD in effect when DTE rolled out the Cash Balance Plan and instead furnished the most current

version from 2016, Sharp's letter noted that ERISA "only requires providing the most current Summary Plan Description." Letter, ECF No. 3-4, PageID.298. Central to the parties' dispute and in response to Nolan's inquiry regarding what the "Minimum 05/31/2002 Benefit" meant and how it was computed, Sharp wrote,

> In 2002, you were given the option to (1) continue accruing benefits under the DTE Traditional Plan, or (2) have your accrued benefit converted to an opening balance in the [Cash Balance Plan], and thereafter earn benefits in the [Cash Balance Plan]. You elected to move into the [Cash Balance Plan].
>
> The IRS does not allow pension participants to be paid a lower benefit than has been accrued at any point in your career. As a result, your DTE Traditional benefit was preserved as a minimum when you moved to the [Cash Balance Plan] and that minimum benefit is called the "Minimum 5/31/2002 Benefit." Your minimum 5/31/2002 Benefit was calculated based on the DTE Traditional Plan formula reflecting your earnings and years of service up to 5/31/2002. In your case, this Minimum 5/31/2002 monthly benefit is larger than the equivalent monthly benefit you have earned in the Cash Balance Plan because you were a full-time employee through November 27, 2001 and reduced to part-time status after that date. Your Minimum 5/31/2002 Benefit was primarily based on your annual compensation as a full-time employee, while the annual Contribution Credits to your Cash Balance account were based on your lower annual compensation as a part-time employee. Because your Minimum 5/31/2002 Benefit is the larger benefit, your monthly Plan benefit payable at your December 2, 2017 commencement date is your Minimum 5/31/2002 Benefit.

*Ibid.* Sharp further explained that Nolan's equivalent monthly benefit earned in the Cash Balance Plan was $987.83, calculated by dividing her cash balance account amount of $190,874.93 by the "Lump Sum Factor" of 193.2273, which was based on IRS specified rules for assumed future life expectancy and interest rates. *Id.*, PageID.299. Based on these representations, the complaint alleges that "DTE concluded that Nolan was entitled to no new pension benefits for the 15½ years she participated in the Cash Balance Plan." Compl. ¶ 48.

## The Administrative Proceedings

On January 9, 2018, Nolan submitted a claim for additional pension benefits to DTE's "Pension Plan Claims" department, asserting that the method and manner of calculating her

-14-

pension entitlement was incorrect for "several reasons." Nolan principally objected to DTE's failure to mention and use of the "larger of" methodology in computing her pension benefit amount. Nolan wrote that Section 6.01 of the Retirement Plan contemplated a "two-part formula" for calculating a participant's "Accrued Benefit," summarizing the methodology for computing benefits for participants under the Traditional Plan and the Cash Balance Plan. Based on Nolan's understanding of that formula, she asserted that "if a DTE employee participated in both plans, their total Accrued Benefit would equal the pension they earned under the traditional plan PLUS the pension they earned under the cash balance plan."

Nolan further asserted that the "larger of" methodology conflicted with representations DTE made to her and other DTE employees who were invited to transfer to the Cash Balance Plan, as they never were told that they would receive the "larger of," "greater of," or "only one of" the benefits they earned under the Traditional Plan and Cash Balance Plan. Nor were they told that if they elected to transfer that they "might earn no new benefits for a significant period of time, or possibly never." Citing the Decision Guide at Page 7, Nolan wrote that she and other employees "were told that [they] would receive the 'frozen' and 'protected' pension [they] had earned under DTE's traditional plan prior to participation in its cash balance plan PLUS the benefits [they] would earn under DTE's cash balance plan." Citing other portions of the Decision Guide, Nolan also asserted that they were told their cash balance benefits would increase each year with the contribution credits and interest credits and that the illustrative charts for the sample employees showed "steady and increasing pension accruals under the cash balance plan." The claim concluded with a request for DTE to recompute Nolan's monthly pension in accordance with the A+B Benefit Promise as spelled out in Section 6.01 of the Retirement Plan, that is, the pension she earned under the Traditional Plan ($1,581.19) plus the pension she earned under the Cash Balance

Plan ($987.83), for a total monthly pension of $2,569.02, subject to any applicable actuarial adjustments.

On February 23, 2018, Janet Polser, a Designated Representative on DTE's Benefit Plan Administration Committee, denied Nolan's claim for additional benefits. In rejecting Nolan's interpretation that Section 6.01 contemplates a "two part formula," Polser wrote that "the applicable Plan definitions provide that a Plan participant is either a DTE Traditional Plan Participant or DTE Cash Balance Plan Participant." Claim Denial, ECF No. 3-6, PageID.306. She explained,

> Section 2.30(b) of the Plan defines "DTE Cash Balance Participant" as specifically including participants who elected to participate in the DTE Cash Balance Plan:
>
> **Section 2.30 "DTE Cash Balance Participant"** means each Eligible Employee:
>
> (b) who on June 1, 2002 was a Nonrepresented full or part-time Employee at least 18 years of age, hired by a Participating Employer on or before July 31, 2001 and who satisfied the Cash Balance Plan election requirements of Section 5.02(b), elected between March 4, 2002 and April 26, 2002 to become a DTE Cash Balance Participant effective as of January 1, 2002 and satisfied the eligibility requirements on June 1, 2002.
>
> Section 2.36(a) of the Plan defines the "DTE Traditional Plan" as specifically excluding any participant who elected to participate in the DTE Cash Balance Plan:
>
> **Section 2.36 "DTE Traditional Plan"** means the traditional DTE defined benefit pension portion of the Plan. The DTE Traditional Plan covers:
>
> (a) DTE Nonrepresented Eligible Employees hired before August 1, 2001 who did not elect to participate in the DTE Cash Balance Plan;
>
> Under the Section 2.36(a), anyone who elected to participate in the DTE Cash Balance Plan does not participate in the DTE Traditional Plan.

Claim Denial, PageID.306-07. These definitions were not included in the Retirement Plan provided to Nolan at the time she made her election. Compl. ¶ 65; *see also* Retirement Plan Definitions, ECF No. 1-2.

Nolan appealed the initial denial of her claim.  In a letter dated April 18, 2018, Nolan criticized DTE's reliance on a more recent version of the Retirement Plan in justifying the denial of her claim.  Citing Section 2.32 of her Retirement Plan from 2001, Nolan wrote that "DTE Traditional Plan" was defined as, in relevant part, "the traditional DTE defined benefit pension portion of the [Retirement] Plan."  PageID.315.  She also referred to a letter dated March 31, 2005 titled "2004 Cash Balance Statement" prepared by Geri Schmidtzinsky, Project Manager for DTE's Retirement Service Center.  Compl. ¶ 67.  In pertinent part the letter noted,

> Please find enclosed the 2004 Cash Balance Statement.  This statement reflects the benefits under the Cash Balance Plan only. You may be eligible for additional benefits under a prior plan if you are a transferred employee.

2004 Cash Balance Statement, ECF No. 3-8, PageID.328.  Based on this representation, Nolan asserted that even a DTE representative believed that persons who transferred from the Traditional Plan to the Cash Balance Plan are entitled to benefits under both plans.  Nolan further contended that DTE's failure to disclose the "larger of" methodology in the Decision Guide violated ERISA § 102, and that repeated suggestions in the Decision Guide to consult with Ayco prior to choosing a plan did not cure the violations.  Nolan emphasized that Ayco's Power Point presentation also failed to mention the "larger of" methodology and instead represented that employees will receive steady and increasing pension accruals under the Cash Balance Plan.  Nolan also contended in her appeal that DTE failed to notify her that the Cash Balance Plan significantly would reduce her future benefit accruals in violation of ERISA § 204(h).

On August 20, 2018, Nolan received the Appeals Committee's final denial of her claim, informing Nolan of her right to sue under ERISA and to request documents relied upon by the Appeals Committee.  The complaint alleges that of the twenty-four documents produced in

response to Nolan's subsequent request, twenty-two of them were created years after DTE introduced and invited employees to join the Cash Balance Plan in 2002.

<u>Litigation</u>

On October 26, 2018, the plaintiff filed her putative class action complaint alleging that the defendants breached the terms of the benefits plan (Count I), failed to state the terms in a manner calculated to be understood by the average plan participant (Count II), and failed to give notice of an amendment to the plan that resulted in a significant reduction (Count III), all in violation of ERISA. As noted above, the defendants filed a motion to dismiss all counts, and then filed a motion for judgment on the administrative record as to Count I.

II.

The governing standards under Rule 12(b)(6) are well known to the parties: the purpose of the motion is to allow a defendant to test whether, as a matter of law, the plaintiff is entitled to legal relief if all the factual allegations in the complaint are taken as true. *Rippy ex rel. Rippy v. Hattaway*, 270 F.3d 416, 419 (6th Cir. 2001) (citing *Mayer v. Mylod*, 988 F.2d 635, 638 (6th Cir. 1993)). The complaint is viewed in the light most favorable to the plaintiff, the factual allegations in the complaint are accepted as true, and all reasonable inferences are drawn in favor of the plaintiff. *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008). To survive the motion, the plaintiff "must plead 'enough factual matter' that, when taken as true, 'state[s] a claim to relief that is plausible on its face.' *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556, 570 (2007). Unsupported conclusions will not suffice. Plausibility requires showing more than the 'sheer possibility' of relief but less than a 'probab[le]' entitlement to relief. *Ashcroft v. Iqbal*, [556 U.S. 662, 678] (2009)." *Fabian v. Fulmer Helmets, Inc.*, 628 F.3d 278, 280 (6th Cir. 2010).

When deciding a motion under Rule 12(b)(6), the Court looks only to the pleadings. *Jones v. City of Cincinnati*, 521 F.3d 555, 562 (6th Cir. 2008). But the Court also may consider the documents attached to them, *Commercial Money Ctr., Inc. v. Illinois Union Ins. Co.*, 508 F.3d 327, 335 (6th Cir. 2007) (citing Fed. R. Civ. P. 10(c)), documents referenced in the pleadings that are "integral to the claims," *id.* at 335-36, documents that are not mentioned specifically but which govern the plaintiff's rights and are necessarily incorporated by reference, *Weiner v. Klais & Co., Inc.*, 108 F.3d 86, 89 (6th Cir. 1997), *abrogated on other grounds by Swierkiewicz v. Sorema, N.A.*, 534 U.S. 506 (2002), and matters of public record, *Northville Downs v. Granholm*, 622 F.3d 579, 586 (6th Cir. 2010); *see also Cates v. Crystal Clear Tech., LLC*, 874 F.3d 530, 536 (6th Cir. 2017) (instructing that "'[w]hen a written instrument contradicts allegations in the complaint to which it is attached, the exhibit trumps the allegations.'") (quoting *Williams v. CitiMortgage, Inc.*, 498 F. App'x 532, 536 (6th Cir. 2012)). However, beyond that, assessment of the facial sufficiency of the complaint ordinarily must be undertaken without resort to matters outside the pleadings. *Wysocki v. Int'l Bus. Mach. Corp.*, 607 F.3d 1102, 1104 (6th Cir. 2010).

## A.

DTE argues that the complaint fails to state a claim for violation of ERISA's disclosure requirements and seeks dismissal of Counts II and III.

## 1.

In Count III of the complaint, Nolan alleges that the defendants failed to provide employees considering a transfer to the Cash Balance Plan with sufficient information to understand that they would be entitled to only the "larger of" the accrued benefits under either the Traditional Plan or the Cash Balance Plan, which resulted in many transferred participants accruing no new pension benefits for several years before retirement. The plaintiff describes this omission as "egregious"

under ERISA § 204(h). The defendants contend that the Decision Guide provided to participants before the 2002 conversion satisfied ERISA's requirement to inform participants of the effect of the plan amendment. The defendants have the better argument.

The version of ERISA § 204(h)(2) applicable in 2002, when the defendants' Cash Balance Plan took effect, stated in pertinent part:

> If an applicable pension plan is amended to provide for a significant reduction in the rate of future benefit accrual, the plan administrator shall provide written notice to each applicable individual . . . . The notice . . . shall be written in a manner calculated to be understood by the average plan participant and shall provide sufficient information (as determined in accordance with regulations prescribed by the Secretary) to allow applicable individuals to understand the effect of the plan amendment.

Economic Growth and Tax Relief Reconciliation Act of 2001, Pub. L. No. 107-16, 115 Stat 38 (2001), 29 U.S.C. § 1054(h) (2001). The notice was to be provided "within a reasonable time before the effective date of the plan amendment." *Ibid.* The statute stated further that "[a] plan amendment which eliminates or significantly reduces any early retirement benefit or retirement-type subsidy . . . shall be treated as having the effect of significantly reducing the rate of future benefit accrual." ERISA § 204(h)(9), 29 U.S.C. § 1054(h)(9).

Nolan contends that DTE did not furnish notice of the plan amendments before they went into effect as required by section 204(h)(2), believing that the effective date of the amendment was December 31, 2001. She is incorrect. Section 1.03 of the plan states that "[t]his amendment and restatement of the Plan shall occur on December 31, 2001 and *unless specified otherwise in the Plan*, the Plan provisions generally are effective December 31, 2001." PageID.64. Section 5.02(b) of the Cash Balance Plan amendment "otherwise" stated that its effective date was June 1, 2002. Nolan acknowledged that the Decision Guide was furnished in February 2002, and she conceded that fact in a letter submitted during the claim process. *See* ECF No. 3-7, Page.ID.325 ("I was

never given notice of the "greater of" methodology or its likely negative impact on my future pension accruals, much less before the effective date of the Plan amendment that bound me to my cash balance election, which was June 1, 2001.).

Nolan also relies on regulations issued in 1998 (she refers to them as 1999 regulations), which did not apply in 2002. But section 204(h) was amended in 2001. The Secretary prescribed regulations implementing the amended section 204(h)(2) in 2003. See 68 Fed. Reg. 17277-02 (Apr. 9, 2003). As for the intervening years, the amendment noted that "[u]ntil such time as the Secretary of the Treasury issues regulations under . . . section 204(h) of the Employee Retirement Income Security Act of 1974, as added by the amendments made by this section, a plan shall be treated as meeting the requirements of such sections if it makes a good faith effort to comply with such requirements." 29 U.S.C. § 1054 (2001).

The defendants insist that the Decision Guide plainly constitutes a "good faith effort" to comply with section 204(h)'s requirements. The Court agrees. The Guide correctly explicated Plan § 6.02 to set out two formulas for computing a participant's accrued benefits: one for "Traditional Plan Participants," and one for the "Cash Balance Plan." As detailed above, the Decision Guide explained how benefits would be calculated under the Cash Balance Plan, including that the plaintiff's accrued benefits under the Traditional Plan would be imputed to the hypothetical account as an "initial cash balance benefit." Therefore, no one could sensibly read the formula in section 6.02 of the Retirement Plan to somehow allow for an "A+B Promise" where that section was set forth in an either/or format, and the Decision Guide unequivocally explained what happened to a participant's benefits earned to date. Nor could anyone sensibly read the words "frozen and protected" to mean that the plaintiff would be entitled to her accrued benefit under the Traditional Plan *plus* whatever she accrued in addition under the Cash Benefit Plan. The

Retirement Plan and the Decision Guide did not use the words "larger of" to communicate how benefits would be calculated, but it did not need to do so when it was obvious from the description that her benefit would be based on one formula or the other, not both. *See Teufel v. Northern Trust Co.*, 887 F.3d 799, 802 (7th Cir. 2018) ("To the extent that Teufel finds the language too complex — well, it seems clear to us, and it isn't apparent how it could have been made much simpler (all of these pension formulas have complexities.")).

Nolan argues that this case is like *Humphrey v. United Way of the Texas Gulf Coast*, 590 F. Supp. 2d 837 (S.D. Tex. 2008), "where the court held that the converted plan required a 'plus' methodology," Plf.'s Br. at 3. However, her reliance on *Humphrey* is misplaced, as there the plan at issue previously and expressly contemplated a "plus" calculation. *See id.* at 840. The employer in that case later modified the plan's language to "greater of" and attempted to attribute the previous use of "plus" to a scrivener's error. *Id.* at 842 ("Indeed, United Way maintains the 'plus' language in the 96 Plan was a 'scrivener's error,' and that the 'greater of' methodology had always been the intended and correct calculation under the 96 Plan."). This case in no way parallels *Humphrey*.

Instead, this case is more like those relied upon by the defendants, where courts credited the employers' efforts to provide examples, modeling tools, and explanations of a possible wear-away period and the impact of fluctuating interest rates. *See Teufel*, 887 F.3d at 802 ("True, what seems clear to a federal judge may not be clear to 'the average plan participant', but Northern Trust provided its staff with an online tool that showed each worker *exactly* what would happen to that worker's pension, under a number of different assumptions about future wages and retirement dates, and under both the pre-2012 approach and the amended plan. A precise participant-specific summation is hard to beat for clarity and complies with § 1054(h)(2)."); *Tomilson v. El Paso Corp.*,

653 F.3d 1281, 1294 (10th Cir. 2011) (finding that employees were on notice of "wear-away" where they were "explicitly warned that their benefits under the old plan would likely be "frozen," and that they would receive the greater of the frozen minimum benefit or the new cash balance benefit") (citing pre-2001 Treasury regulations); *Jensen v. Solvay Chemicals, Inc.*, 625 F.3d 641, 652 (10th Cir. 2010) (finding that the notice complied with section 204(h) because it "provide[d] illustrative examples comparing the expected monthly benefit under the new plan with the expected monthly benefit that would have been earned if the old plan had continued; the examples concern employees of different ages, compensation, service years, and time of retirement. By finding the example most like himself, an employee can estimate his benefit reduction in dollar terms.") (citing 2003 Treasury regulations).

The only remotely persuasive argument made by the plaintiff that the information was not pellucid is that the Decision Guide's examples were limited to interest rates greater than 5.48% (the average 30-year Treasury rate at the time). However, the Decision Guide instructed not only to vary the assumption when using the online modeling tool, but also that "decreasing this assumption will decrease your projected benefits under this plan." In light of the governing "good faith effort" standard, the defendants did not violate their obligations under section 204(h) by not including more information in the Decision Guide. *See Johnson v. Meriter Health Servs.*, 29 F. Supp. 3d 1175, 1199 (W.D. Wis. 2014) (declining to decide the merits but nevertheless acknowledging that "the plain language of the notice appears to undermine plaintiffs' challenges, especially giving defendants the benefit of the good faith safe harbor provision.").

It is true that neither the Decision Guide nor the Workshop PowerPoint slides include the term "wear away." But the failure to use that "pension jargon," *Amara*, 563 U.S. at 431, does not undercut the reasonableness of the notice, when that concept was explained in the Decision

Guide's warning that "due to the application of the cash balance formula in the [Cash Balance Plan], it is possible that your benefit will not grow initially or may grow at a slower rate than under the Traditional Pension Plan." Decision Guide, ECF No. 1-5, PageID.268. And when counselling participants to use the modeling features, the Decision Guide warned, "do you find the [Cash Balance Plan] benefit does not catch up to the frozen accrued benefit under your Traditional Pension Plan for a number of years? If this happens and you are planning to leave DTE Energy during this time, your pension benefit may not grow." *Id.* PageID.254.

The plaintiff also argues that the notice failed to mention the elimination of the early retirement subsidy. However, as the defendants note, the elimination of the early retirement subsidy is a triggering event for notice under section 204(h), not content that must be included in the notice. In any event, the Decision Guide explained that the "the value of your early retirement factors were not included in your initial cash balance benefit." ECF No. 1-5, PageID.255. These explanations fortify the finding that the Decision Guide amounts to a "good faith effort" to comply with section 204(h). Count III fails to state a plausible claim under ERISA § 204(h).

2.

In Count II of the complaint, Nolan alleges that the Decision Guide fails to meet the requirements of a "summary material modification" (SMM) under ERISA § 102(a), 29 U.S.C. § 1022(a). Under that statute, an employer must furnish to participants a "summary plan description" (SPD), which is designed to provide "sufficiently accurate and comprehensive" information to "reasonably apprise such participants . . . of their rights and obligations under the plan." 29 U.S.C. § 1022(a). That information includes "the plan's requirements respecting eligibility for participation and benefits" as well as "circumstances which may result in disqualification, ineligibility, or denial or loss of benefits." 29 U.S.C. § 1022(b). When a plan is

amended, the employer is required to provide a "summary of any material modification in the terms of the plan and any change in the information" required for SPDs, "written in a manner calculated to be understood by the average plan participant." 29 U.S.C. § 1022(a).

The parties agree that the Decision Guide constitutes an SMM under ERISA § 102(a). The plaintiff challenges the defendants' compliance based on the same grounds presented in Count III: (i) the Decision Guide's failure to affirmatively note the "larger of" methodology, which could result in a loss of benefits compared to the Traditional Plan; and (ii) the Decision Guide's failure to explain clearly that some participants may earn no new benefits for an extended period of time, or never. This claim suffers from the same defects as the plaintiff's section 204(h) claim: the language of the Decision Guide reasonably explained how the plaintiff's benefits would be calculated and that based on a participant's particular circumstances and other assumptions, including fluctuating interest rates, there existed a possibility of a wear-away period. *See Jensen*, 625 F.3d at 657 ("As for any other possible defects in the SMM, we would assume that a notice that complies with the disclosure requirements of § 204(h) would satisfy in that respect the requirements of an SMM.").

The plaintiff attempts to salvage this claim by analogizing the facts of this case to *Osberg v. Foot Locker, Inc.*, 862 F.3d 198 (2d Cir. 2017), and *Amara v. CIGNA Corporation*, 775 F.3d 510 (2d Cir. 2014), where the district courts ruled in favor of the plaintiffs on their section 102 claims and the Second Circuit affirmed. However, as the defendants note, the plaintiff's reliance is misplaced. In both cases, the employers forced the conversion to a cash balance plan on employees, and the courts found that the employers deliberately misled employees regarding a potential wear-away period. *See Osberg*, 862 F.3d at 204 ("While the SPD provided a general description of the methodology by which participants' account balances would be calculated under

the cash balance plan, it lacked any description of wear-away or any indication that the conversion would cause a benefits freeze for most participants. In fact, the district court found that the SPD and other Foot Locker communications not only failed to disclose wear-away, but 'were designed to conceal that information.'"); *Amara*, 775 F.3d at 530-31 ("[T]he district court found that CIGNA specifically instructed its benefits department and consulting company 'not to provide benefits comparisons under the old and new plans,' even though employees explicitly requested such a comparison. By doing so — and by affirmatively misrepresenting the effects of the conversion — CIGNA successfully lulled employees, thus avoiding any 'notable controversy.'").

The same fairly cannot be said here. The Decision Guide contained explanations, comparisons, and cautions that were explicit here, and assiduously avoided in *Osberg* and *Amara*. The information furnished by DTE's multi-modal informational campaign "reasonably apprise[d]" its employees of "their rights and obligations under the plan," 29 U.S.C. § 1022(a), as well as that the consequences of electing the Cash Balance Plan might result in the "loss of benefits," 29 U.S.C. § 1022(b).

Count II fails to state a plausible claim for relief.

## B.

DTE contends that the complaint, including the remaining Count I, should be dismissed because it was filed out of time. In Count I, Nolan seeks to recover benefits due under section 6.02 of the Retirement Plan, which she construes as establishing a "two-part formula" for computing a participant's accrued benefits. She believes that she is entitled to additional benefits under ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), which allows a plan participant to "'recover benefits due to [her] under the terms of [her] plan, to enforce [her] rights under the terms

of the plan or to clarify [her] rights to future benefits under the terms of the plan.'" *Patterson v. Chrysler Grp., LLC*, 845 F.3d 756, 762 (6th Cir. 2017) (quoting 29 U.S.C. § 1132(a)(1)(B)).

DTE says that Nolan made this claim too late. "Because ERISA does not explicitly provide a limitations period for § 1132(a)(1)(B) claims, courts fill the statutory gap using federal common law." *Ibid.* (citations omitted). "When a plan does not itself provide a limitations period, the Sixth Circuit applies 'the most analogous state statute of limitations' of the forum state." *Id.* at 762-63 (quoting *Santino v. Provident Life & Accident Ins. Co.*, 276 F.3d 772, 776 (6th Cir. 2001)). "The Sixth Circuit has found that the most analogous Michigan cause of action to a denial-of-benefits claim under § 1132(a)(1)(B) is breach of contract." *Id.*at 763 (citing *Santino*, 276 F.3d at 776). "[T]he statute of limitations for a breach-of-contract action under Michigan law is six years." *Ibid.* (citing Mich. Comp. Laws § 600.5807).

"Similarly, because ERISA is silent on the matter, federal common law determines when claims accrue under § 1132(a)(1)(B) for purposes of the statute of limitations." *Ibid.* (citations omitted). "The Sixth Circuit applies the discovery rule to determine when the limitations period for a § 1132(a)(1)(B) claim starts." *Ibid.* (citing *Morrison v. Marsh & McLennan Cos.*, 439 F.3d 295, 302 (6th Cir. 2006)). "Under the discovery rule, 'the limitations period begins to run when the plaintiff discovers, or with due diligence should have discovered, the injury that is the basis of the action.'" *Id.* 763-64 (quoting *Redmon v. Sud-Chemie Inc. Ret. Plan for Union Emps.*, 547 F.3d 531, 535 (6th Cir. 2008)). "Thus, clear and unequivocal repudiation of benefits, whether through formal or informal means, causes the claim to accrue for statute-of-limitations purposes." *Id.* at 764 (citing *Morrison*, 439 F.3d at 302).

Here the parties agree that the applicable statute of limitations is six years. They disagree, however, as to when the plaintiff's claim for denial of benefits accrued. The defendants rely on

the "clear repudiation" rule outlined above, while the plaintiff contends that under *Heimeshoff v. Hartford Life & Accident Insurance Coompany*, 571 U.S. 99 (2013), her claim accrued when the final administrative denial was issued.

But as the defendants correctly point out, *Heimeshoff* did not consider when a section 502(a)(1)(B) claim accrues under the federal discovery rule. In *Heimeshoff*, the Supreme Court resolved a circuit split on the narrow issue of whether a contractual limitations provision in an employee benefits plan that requires participants to bring suit within three years after "proof of loss" is due is enforceable where the separate requirement that participants exhaust administrative remedies before filing suit effectively shortens the limitations period. *Id.* at 102. In holding that the limitations provision is enforceable, the Court acknowledged that,

> ERISA and its regulations require plans to provide certain presuit procedures for reviewing claims after participants submit proof of loss (internal review). *See* 29 U.S.C. § 1133; 29 C.F.R. § 2560.503–1 (2012). The courts of appeals have uniformly required that participants exhaust internal review before bringing a claim for judicial review under § 502(a)(1)(B). *See LaRue v. DeWolff, Boberg & Associates, Inc.*, 552 U.S. 248, 258-259, 128 S. Ct. 1020, 169 L.Ed.2d 847 (2008) (ROBERTS, C.J., concurring in part and concurring in judgment). A participant's cause of action under ERISA accordingly does not accrue until the plan issues a final denial.

*Id.* at 105.

The plaintiff relies on the last sentence of that paragraph in isolation to support her position that the clock did not begin to run on her section 502(a)(1)(B) claim until after her administrative denial was issued on August 16, 2018. However, a closer reading of *Heimeshoff* reveals that her reliance on that proposition in this context is not justified. In context, the Court explained,

> ERISA § 502(a)(1)(B) does not specify a statute of limitations. Instead, the parties in this case have agreed by contract to a 3-year limitations period. The contract specifies that this period begins to run at the time proof of loss is due. Because proof of loss is due before a participant can exhaust internal review, Heimeshoff contends that this limitations provision runs afoul of the general rule that statutes of limitations commence upon accrual of the cause of action.

For the reasons that follow, we reject that argument. Absent a controlling statute to the contrary, a participant and a plan may agree by contract to a particular limitations period, even one that starts to run before the cause of action accrues, as long as the period is reasonable.

*Id.* at 105-106.

Addressing this issue, the Sixth Circuit in *Patterson* confirmed, albeit in a footnote, that the clear repudiation rule applies even after *Heimeshoff*.  The court explained that a "formal denial" was not necessary for the accrual of a section 502(a)(1)(B) claim, as implied by *Stevens v. Employer-Teamsters Joint Council No. 84 Pension Fund*, 979 F.2d 444, 451 (6th Cir. 1992), which the court distinguished.  *Patterson*, 845 F.3d at 763 n. 7.  Instead, the court relied on *Morrison* and *Redmon* to articulate "two clear rules: (1) the statute of limitations for a claimant's § 1132(a)(1)(B) claim begins to run upon clear and unequivocal repudiation of benefits; and (2) unless excused, claimants must exhaust their administrative remedies before bringing their claims to federal court." *Patterson*, 845 F.3d at 763 n. 7.

With the first of those rules in mind, DTE contends that the plaintiff's claim accrued in 2002, because that was when she was informed (through the Decision Guide) that the Retirement Plan operated in a manner completely at odds with her claimed benefit entitlement under an A+B theory.  The defendants believe that this inconsistency amounts to a clear repudiation.  In response, Nolan argues that her section 502(a)(1)(B) claim is based on the defendants' breach of the "A+B Promise" under the Retirement Plan itself, which was not provided until sometime after October 2017 when she initiated the claim review process.  She further argues that she had no idea before her initial claim denial in November 2017 that the defendants would use a "larger of" methodology in computing her benefits.

But the plaintiff cannot rely on her misunderstanding to delay the accrual of her claim, because the Decision Guide constituted substantively-sufficient notice. As discussed above, the Decision Guide provided a cogent explanation of how the Cash Balance Plan would work for participants like the plaintiff who elect to transfer to it. That explanation clearly and unequivocally repudiated any claim for benefits that would be inconsistent with the Retirement Plan's terms. Therefore, the claim accrued when the plaintiff was given notice of the amendment, not when she made her claim several years later. *See Winnett v. Caterpillar*, 609 F.3d 404, 410 (6th Cir. 2010) ("Were it otherwise, the limitations period would start at a different point for every employee or retiree, even though they all work (or worked) for the same company and even though they all face the same change in benefits."); *Union Pac. R.R. Co. v. Beckham*, 138 F.3d 325, 331 (8th Cir. 1998) (holding that the participants' claims accrued when they were "unequivocally informed" that they would not receive any benefit credit for certain service and could have filed a cause of action challenging the employer's interpretation of "credited service"); *Johnson*, 29 F. Supp. 3d at 1200 (explaining that when an initial wear-away period occurred, "defendants had transitioned plaintiffs' benefits to the new plan, and plaintiffs knew or should have known about any wear-away claim based on the § 204(h) notice").

Furthermore, the plaintiff indicates that in 2005 she received a letter and accompanying statement of her benefits accrued to date under the Cash Balance Plan. 2004 Cash Balance Statement, ECF No. 3-8, PageID.328. The plaintiff says that the letter suggested that she might be eligible for more benefits as a transferred employee and that supports her interpretation of the "two-part formula" in the Retirement Plan. However, with due diligence the plaintiff would have learned at that time that her interpretation was flawed if she had inquired about what other benefits

may be available.  She did not, and instead decided to wait until shortly before retirement to review the amounts to which she felt entitled.

The plaintiff should have filed her lawsuit by 2008 or more generously by 2011.  Because she failed to do so, Count I is time-barred and subject to dismissal.

III.

None of the counts of the plaintiff's complaint state claims upon which relief can be granted.  Count I is time-barred and Counts II and III fail as a matter of law.

Accordingly, it is **ORDERED** that the defendants' motion to dismiss the complaint (ECF No. 22) is **GRANTED**.

It is further **ORDERED** that the complaint is **DISMISSED WITH PREJUDICE**.

It is further **ORDERED** that the defendants' motion for judgment on the administrative record (ECF No. 27) is **DISMISSED as moot**.

s/David M. Lawson<br>
DAVID M. LAWSON<br>
United States District Judge

Date:  July 9, 2019

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first-class U.S. mail on July 9, 2019.

s/Susan K. Pinkowski<br>
SUSAN K. PINKOWSKI