# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

<table>
<tr><td>Deborah S. Hunt<br>Clerk</td><td>100 EAST FIFTH STREET, ROOM 540<br>POTTER STEWART U.S. COURTHOUSE<br>CINCINNATI, OHIO 45202-3988</td><td>Tel. (513) 564-7000<br>www.ca6.uscourts.gov</td></tr>
</table>

Filed: March 23, 2021

Mr. Mark Bruce Blocker
Mr. Christopher Kenneth Meyer
Sidley Austin, One S. Dearborn Street
Chicago, IL 60603

Ms. Eva T. Cantarella
Mr. Robert P. Geller
Ms. Patricia A. Stamler
Hertz Schram
1760 S. Telegraph Road, Suite 300
Bloomfield Hills, MI 48302

Ms. Antoinette S. Porter
One Energy Plaza, 1640 WCB
Detroit, MI 48226

Re:  Case No. 19-1867, *Leslie Nolan v. Detroit Edison Company, et al*
     Originating Case No. : 2:18-cv-13359

Dear Counsel,

The court today announced its decision in the above-styled case.

Enclosed is a copy of the court's opinion together with the judgment which has been entered in conformity with Rule 36, Federal Rules of Appellate Procedure.

Yours very truly,

Deborah S. Hunt, Clerk

Cathryn Lovely
Deputy Clerk

cc:  Ms. Kinikia D. Essix

Enclosures

Mandate to issue.

RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 21a0068p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

LESLIE D. NOLAN,

              *Plaintiff-Appellant*,

   *v.*

DETROIT EDISON COMPANY; DTE ENERGY CORPORATE
SERVICES, LLC; DTE ENERGY COMPANY RETIREMENT
PLAN; DTE ENERGY BENEFIT PLAN ADMINISTRATION
COMMITTEE; JANET POSLER; QUALIFIED PLAN APPEALS
COMMITTEE; MICHAEL S. COOPER; RENEE MORAN;
JEROME HOOPER,

              *Defendants-Appellees*.

> No. 19-1867

———————————

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:18-cv-13359—David M. Lawson, District Judge.

Argued: February 6, 2020

Decided and Filed: March 23, 2021

Before: BATCHELDER, STRANCH, and NALBANDIAN, Circuit Judges.

———————————

## COUNSEL

**ARGUED:** Eva T. Cantarella, HERTZ SCHRAM, PC, Bloomfield Hills, Michigan, for
Appellant. Chris K. Meyer, SIDLEY AUSTIN LLP, Chicago, Illinois, for Appellees.
**ON BRIEF:** Eva T. Cantarella, HERTZ SCHRAM, PC, Bloomfield Hills, Michigan, for
Appellant. Chris K. Meyer, Mark B. Blocker, SIDLEY AUSTIN LLP, Chicago, Illinois, for
Appellees.

No. 19-1867                     *Nolan v. Detroit Edison Co., et al.*                     Page 2

———————

## OPINION

———————

JANE B. STRANCH, Circuit Judge.   Leslie Nolan is one of many American workers impacted by the previous decision of employers to move away from traditional pension plans. In 2002, her employer, Detroit Edison Company (DTE),[1] created a cash balance pension plan for all new employees and invited its existing employees to transfer from their traditional defined benefit plan to the new plan.   Nolan accepted.   When she retired in December 2017, DTE told Nolan that her monthly pension benefit would be what she had accrued as of 2002 under the old traditional pension plan, despite her participation in the new cash balance plan for 15½ years after transfer.   Nolan brings class action claims alleging that DTE made misleading promises and failed to explain the new plan's risks, in violation of several provisions of the Employee Retirement Income Security Act (ERISA).[2]   The district court granted DTE's motion to dismiss, finding that Nolan's allegations were untimely or failed to state a claim.   We **REVERSE** in part, **AFFIRM** in part, and **REMAND** the case for further proceedings consistent with this opinion.

## I.  BACKGROUND

### A.     Traditional Pension Plans and Cash Balance Pension Plans

This case centers around DTE's invitation to employees to transfer from a traditional defined benefit pension plan to a cash balance plan, another type of defined benefit (DB) plan. Traditional DB plans typically compute pensions as a percentage of an employee's average salary for their most recent or highest earning years multiplied by years of service and a plan-specific multiplier.   Dana M. Muir, *Counting the Cash: Disclosure and Cash Balance Plans*, 37 J. Marshall L. Rev. 849, 854 (2004).   This calculation produces a benefit expressed as a

---

[1]The other Defendant-Appellees are DTE Energy Company Services, LLC, DTE Energy Company Retirement Plan, DTE Energy Benefit Plan Administration Committee, Janet Posler, Qualified Plan Appeals Committee, Michael S. Cooper, Renee Moran, and Jerome Hooper.  This opinion refers to all Defendants as DTE.

[2]Specifically, Nolan claims DTE breached the terms of the Plan and failed to provide appropriate disclosures in violation of ERISA § 102, codified at 29 U.S.C. § 1022 and ERISA § 204(h), codified at 29 U.S.C. § 1054(h).

monthly annuity payable at normal retirement age for the rest of the participant's life.  *Id.*  Cash balance plans, on the other hand, define benefits by reference to a hypothetical account periodically credited with assumed contributions as well as interest credits.  *Id.* at 855–56. Contribution credits are hypothetical contributions an employer makes, "usually expressed as a percentage of wages or salary," and interest credits are modeled earnings linked to an outside index such as the one-year Treasury bill rate.  *Register v. PNC Fin. Servs. Grp., Inc.*, 477 F.3d 56, 62 (3d Cir. 2007).

In the 1990s, many employers began converting their defined benefit plans from traditional into cash balance plans to reduce their pension costs.  Edward A. Zelinsky, *The Cash Balance Controversy*, 19 Va. Tax Rev. 683, 705, 713 (Spring 2000) ("*Zelinsky Paper*"). Conversions often eliminate early retirement benefits, which are typically available under traditional plans.  *Zelinsky Paper* at 699.  And a move from traditional to cash balance plans tends to involve "wear away," which "occurs when an employee continues to work at a company but does not receive additional benefits for those additional years of service."  *Amara v. CIGNA Corp.*, 775 F.3d 510, 516 (2d Cir. 2014).  This happens when the cash balance benefit never exceeds the already-earned annuity benefit under the traditional formula.  *Zelinsky Paper* at 702. "[A]fter the cash balance conversion, the employee's actual pension entitlement does not grow until her hypothetical account balance under the cash balance methodology equals ('wears away') and begins to exceed the value of the benefit she had earned previously under the traditional pension formula."  *Id.*  It can take years for the cash balance benefit to catch up to the traditional plan benefit.  *Id.* at 703–04.  And it inevitably takes longer for the cash balance benefit of older workers with longer terms of service to catch up to their traditional benefit because they have amassed a larger benefit under the traditional plan than younger employees with shorter terms of service.  *Private Pensions: Implications of Conversions to Cash Balance Plans*, U.S. General Accounting Office (Sept. 2000), 5, 9 ("*GAO Report*").

Pursuant to ERISA and the Age Discrimination in Employment Act (ADEA), "the rate of an employee's benefit accrual" may not be ceased or reduced because of the employee's age. ERISA § 204(b)(1)(H); 29 U.S.C. 623(i)(1)(A).  A "participant's accrued benefit" may also not be "reduced on account of any increase in his age or service."  ERISA § 204(b)(1)(G).

Plan amendments that convert traditional plans to cash balance plans do not violate these ERISA requirements and ADEA protections against age discrimination if they define employees' accrued benefit as the "sum of" the pre-conversion accrued benefit under the traditional plan and the credits earned under the cash balance plan. ERISA § 204(b)(5)(B)(iii). This is because benefits calculated using this "sum of" method do not lead to the wear-away phenomenon. *See Amara*, 775 F.3d at 527 n.13.

As employers converted traditional plans into cash balance plans, plan administrators often failed to provide participants with adequate information about the effects of adopting cash balance plans. *Zelinsky Paper* at 729–30, 754; *GAO Report* at 6, 39.

**B.     ERISA Disclosure Requirements**

Congress created ERISA to protect the interests of participants in their employee benefit plans, including by (1) "requiring the disclosure and reporting to participants and beneficiaries"; (2) "establishing standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans"; and (3) "providing for appropriate remedies, sanctions, and ready access to the Federal courts." 29 U.S.C. § 1001(a)–(b). ERISA requires that information be provided regularly to participants to aid them in protecting their benefits. ERISA § 102 requires that summary plan descriptions (SPDs) and summaries of material modifications (SMMs) be provided and written accurately, comprehensively, and in terms calculated to be understood by the average plan participant. ERISA § 102(a). Circumstances that may result in benefit losses must be appropriately disclosed in the SPD. ERISA § 102(b).

Congress added ERISA § 204(h) in 1986 and amended it in 2001 to require that pension plan amendment notices authorizing "a significant reduction in the rate of future benefit accrual" (i) be "written in a manner calculated to be understood by the average plan participant," (ii) "provide sufficient information (as determined in accordance with regulations prescribed by the Secretary)" to allow participants to "understand the effect of the plan amendment," and (iii) be furnished "within a reasonable time before the effective date of the plan amendment." *Economic Growth and Tax Relief Reconciliation Act of 2001* (EGTRRA). P.L. 107-16 (June 7, 2001), § 659(b); ERISA § 204(h)(2)–(3) (2001). These changes to ERISA § 204(h) applied to

"plan amendments taking effect on or after the date of the enactment" of the Economic Growth and Tax Relief Reconciliation Act, June 7, 2001. P.L. 107-16 (June 7, 2001), §659(c)(1). Until the Treasury Department issued new regulations under ERISA § 204(h) in 2003, a plan was treated as meeting ERISA § 204(h)'s updated requirements if it made a "good faith effort to comply with such requirements." *Id.* § 659(c)(2).

## C.      DTE's Traditional and Cash Balance plans

In 2002, DTE invited its employees to transfer from a traditional plan to a cash balance plan. At that time, the traditional and cash balance plans became part of a single pension plan document, and new employees, who had never participated in the traditional plan, could enroll only in the cash balance plan. The plan was amended effective December 31, 2001 and "unless specified otherwise in the Plan, the Plan provisions" became effective on that date. Section 5.02(b) describes the new cash balance plan and states that employee elections became effective on June 1, 2002.

DTE provided participants with a Decision Guide that served as a Summary of Material Modifications. According to the Complaint, the Guide promises that if employees agree to transfer to the cash balance plan, they will receive their "frozen and protected" traditional plan benefit earned as of the date of the transfer and contribution credits and interest credits earned under the cash balance plan. The Complaint labels this methodology "the A+B Benefit Promise." Drawing all reasonable inferences in Nolan's favor, A is defined as the "frozen and protected" traditional plan benefit, and B defined as contribution credits and interest credits earned under the cash balance plan.[3] The "A+B" methodology is the same as the "sum of" computation described in ERISA § 204(b) and discussed above. ERISA § 204(b)(1)(H)(vi)(5)(B)(iii); *see also Amara*, 775 F.3d at 527 n.13.

---

[3] The A+B Promise is not always clearly defined in the Complaint. In some places, Nolan appears to define B as the annuity accrued under the cash balance formula, which would already include her traditional plan annuity in the form of the initial cash balance. In other places, however, the Complaint says B means "benefit accruals under the Cash Balance Plan in the form of 'Contribution Credits' and 'Interest Credits,'" without the initial cash balance. On appeal, Nolan makes clear that A+B means her frozen and protected traditional plan benefit plus contribution and interest credits. Thus, this opinion construes the allegations in Nolan's favor and evaluates the claims using this second explanation of the B portion of the A+B promise.

The Guide explains that under the traditional plan, pensions are computed as a percentage of pay multiplied by years of service and are payable as annuities only. Under the cash balance plan, benefits earned through the traditional plan "would be converted to an initial cash balance benefit," that "increases each year" with contribution credits, equal to 7% of the participant's eligible annual earnings and interest credits based on the 30-year Treasury rates. Unlike the traditional plan benefit, which is expressed as an annuity and paid as an annuity at retirement, the cash balance benefit is expressed as a lump sum and can be taken as a lump-sum payout or an annuity.

Regarding converting the accrued benefit from the traditional plan into "an initial cash balance benefit," the Guide specifies that the plan would use "a present value conversion factor" based on participants' age. The traditional plan benefit would be "frozen and protected," and participants would "stop earning benefits" under the traditional plan and "begin earning benefits under" the cash balance plan.

The Guide includes eight graphs for four hypothetical employees to help employees compare benefit accrual rates between the traditional and cash balance plans. The graphs compare the value of each retirement program, "varying the assumption for future cash balance interest credits from 6% to 8%" to show how these different potential interest rates impact benefit projections. The parts of the graphs showing the "value of benefits" are not assigned any numbers, making it difficult to determine the real value difference between the depicted traditional and cash balance benefit. Some of the graphs show that employees would earn a lower benefit by transferring to the cash balance plan than they would accrue by remaining in the traditional plan, but the graphs all show the employees continuing to earn new benefits after the transfer. In other words, none of the graphs represent the effect that switching plans will have on the actual amount received from the pension (the wear away period). It thus may be difficult to understand from the graphs that employees electing to transfer to the cash balance plan do not add meaningful value to their pension entitlements until the wear away period is over. For example, for the hypothetical employee Terry, who had twenty-two years of service at the time of the cash balance transfer and an initial cash balance of $63,208.05, the graphs show a steadily increasing benefit under the cash balance formula under either interest rate:



(R. 1-3, Guide, PageID 244)

The Guide references a presentation with slides given at a financial planning seminar presented by Ayco, an independent consulting firm hired by DTE. One slide is titled "How Your Cash Balance Benefit Grows in 2002," and shows four example employees, listing their initial cash balance, their hypothetical interest credits and compensation credits, and the sum of those terms which it shows as the employee's cash balance benefit at the end of the following year. Terry had an accrued benefit under the traditional plan of $1,788-per-month annuity beginning at age sixty-five, which annuity translated into a lump-sum initial cash balance benefit of $63,226. According to the chart, Terry would see his cash balance benefit grow to $71,661 by the end of 2002 once interest and compensation credits of $3,465 and $4,970 were added to his initial balance:

| How Your Cash Balance Benefit Grows in 2002 | | | | |
|---|---|---|---|---|
| *Non-Represented Employees* | | | | |
| Assumptions: • 2002 annual compensation: Chris = $49,000; Terry = $71,000; Pat = $60,000; Dale = $75,000 | | | | |
| | **Chris** | **Terry** | **Pat** | **Dale** |
| Initial Cash Balance Benefit | $2,326 | $63,226 | $134,743 | $373,493 |
| Interest credit* | $127 | $3,465 | $7,384 | $20,467 |
| Pay credit* | $3,430 | $4,970 | $4,200 | $5,250 |
| Cash Balance Benefit @ 12/31/02 | $5,883 | $71,661 | $146,327 | $399,210 |
| * Credited annually on 12/31. | | | | |

(R. 3-10, Presentation, PageID 348)  The presentation materials include nine additional graphs showing steadily increasing benefit accruals under the cash balance plan, even where the charts indicate that an employee would be better off participating in the traditional plan.

Under the heading "What Should I Keep in Mind as I review All of My Modeler Results," the Guide lists, among other things, "Your Age."  Under that subheading, this text appears:

> The pension benefit you earned at conversion under the Traditional Pension Plan is protected under [the cash balance plan].  Although the [cash balance plan] grows at a steady rate, do you find the [plan] does not catch up to the frozen accrued benefit under your Traditional Pension Plan for a number of years?  If this happens and you are planning to leave DTE Energy during this time, your pension may not grow.

> Do you notice more than one crossover point?  Which benefit is better if you expect to leave DTE Energy at an age before or after each crossover point?

(R. 1-5, Guide, PageID 254)  On the next page, page 32 of the Guide, a text box with the heading "If you are close to early retirement age…" states, that even though the cash balance account "grows at a steady rate," participants may notice that their "benefit does not catch up to the frozen accrued benefit under your Traditional Pension Plan for a number of years" in part "because the value of your early retirement factors were not included in your initial cash balance benefit."  It continues,

> If you choose the [cash balance plan], effective on June 1, 2002, your traditional pension plan benefit on May 31, 2002 is frozen and protected.  Therefore, the value of your [cash balance plan] benefit will never be less than the greater of the benefit that you had on December 31, 2001 or May 31, 2002 under the Traditional Pension Plan.

(*Id.*)  The Guide explains that benefits depend "on the retirement program you choose," including "changes in your pay, years of service," and "changes in the interest rates."

## D.    Nolan's Experience

Nolan agreed to transfer from her traditional plan to the new cash balance plan, believing that her accrued benefit under the traditional plan would be "frozen and protected" and that she would receive that benefit plus new credits accrued under the cash balance plan when she retired.

When she transferred, Nolan had twenty-two and a half years of service with DTE and had earned a benefit under the traditional plan of $1,581.19 per month. This benefit was computed as a percentage of Nolan's pay, multiplied by years of service, and expressed as a monthly annuity.

A few years later in 2005, Nolan received a letter signed by DTE's Project Manager for Retirement Services, which stated:

> Please find enclosed the 2004 Cash Balance Statement. This statement reflects the benefits under the New Horizon Cash Balance Plan only. You may be eligible for additional benefits under a prior plan if you are a transferred employee.

(R. 3-8, Schmidtzinsky Letter, PageID 328-29) The attached 2004 Cash Balance Statement shows Nolan's benefits increasing with contribution credits and interest credits.

Nolan retired from her position as a Financial Analyst with DTE 15 ½ years after the transfer and after 38 years of service. A few months before Nolan retired in 2017, DTE sent her a "pension calculation statement," which included her payment options and the pension she would receive under each option if she retired on December 2, 2017. The statement listed Nolan's purported "Minimum 5/31/2002 Benefit" and "Minimum 12/31/2001 Benefit" without defining the term "minimum benefit." On October 14, 2017, Nolan wrote to the plan administrator requesting clarification of undefined terms including the references to her minimum benefit; she also asked for the pension calculation methodology, copies of the traditional and cash balance plans, and copies of the SPDs.

Emily Sharp, DTE's Supervisor of Retirement Income Benefits, responded on November 6, 2017. To Nolan's question about what "Minimum 5/31/2001 Benefit" meant, Sharp wrote,

> In 2002, you were given the option to (1) continue accruing benefits under the DTE Traditional Plan, or (2) have your accrued benefit converted to an opening balance in the [cash balance plan], and thereafter earn benefits in the [cash balance plan]. You elected to move into the [cash balance plan].
>
> The IRS does not allow pension participants to be paid a lower benefit than has been accrued at any point in your career. As a result, your DTE Traditional benefit was preserved as a minimum when you moved to the [cash balance plan] and that minimum benefit is called the "Minimum 5/31/2002 Benefit." Your minimum 5/31/2002 Benefit was calculated based on the DTE Traditional Plan

formula reflecting your earnings and years of service up to 5/31/2002. In your case, this Minimum 5/31/2002 monthly benefit is larger than the equivalent monthly benefit you have earned in the Cash Balance Plan because you were a full-time employee through November 27, 2001 and reduced to part-time status after that date. Your Minimum 5/31/2002 Benefit was primarily based on your annual compensation as a full-time employee, while the annual Contribution Credits to your Cash Balance account were based on your lower annual compensation as a part-time employee. Because your Minimum 5/31/2002 Benefit is the larger benefit, your monthly Plan benefit payable at your December 2, 2017 commencement date is your Minimum 5/31/2002 Benefit.

(R. 3-4, Sharp Letter, PageID 297–301) Sharp stated that Nolan had earned a monthly benefit of $987.83 through the cash balance plan, calculated by dividing her cash balance account amount of $190,874.93 by the "Lump Sum Factor" of 193.2273, which was based on IRS specified rules for assumed future life expectancy and interest rates. DTE would pay Nolan the pension she earned under the traditional plan ($1,581.19 per month) because it was "larger" than the $987.83-per-month pension earned through the cash balance plan. Sharp also provided Nolan with a copy of the Plan. Sharp did not provide any SPD in effect in 2002 when DTE invited Nolan to transfer to the cash balance plan.

Nolan initially concluded that her benefit should have equaled $2,569.02 per month, the sum of her "frozen and protected" traditional plan benefit ($1,581.19) and the benefit she believed, based on DTE's representations, she accrued under the cash balance plan ($987.83). Nolan filed an administrative claim for that amount.

After the plan administrator denied her claim, Nolan retained an actuary to review the pension calculations. Nolan's actuary determined that the annuity earned under the cash balance plan was $402.55 per month at Nolan's early retirement age of 59 years and 3 months, and that Nolan was entitled to a total benefit of $1,983.74 per month ($1,581.19 + $402.55). According to her actuary, when Nolan transferred to the cash balance plan, her traditional plan benefit was converted into "the initial cash balance benefit," using the 30-year Treasury rate of 5.48% for September of the prior year. This yielded a $59,932.23 initial cash balance benefit. Under the cash balance benefit plan, Nolan then accrued interest credits and contribution credits. When a higher interest rate is used to convert a lump sum into an annuity, the calculation will lead to a higher annuity than if a lower interest rate is used. If the same interest rate that was used to

compute Nolan's initial cash balance benefit were also used to convert the protected benefit back to an annuity, then the result would be her initial $1,581.19 annuity. Use of a lower rate to convert the lump sum to an annuity yields a smaller annuity. DTE used lower annuity conversion rates to translate Nolan's initial cash balance back to an annuity such that when she retired, the value of what she thought was her "frozen and protected" $1,581.19-per-month annuity had purportedly fallen to $585.25 per month. When this decreased initial cash balance is added to the annuity Nolan's actuary derived from her contribution and interest credits of $402.55 per month, the sum is $987.83 per month—the amount DTE determined Nolan was entitled to under the cash balance plan. The significant devaluing of Nolan's initial cash balance is relevant if she is entitled only to her accrued traditional plan benefit *or* her total cash balance plan amount, but it does not impact her benefits if she is entitled to "A+B"—the frozen and protected initial cash balance plus interest credits and contribution credits.

## E. Proceedings Below

On October 26, 2018, Nolan filed a putative class action Complaint against DTE. She alleged (1) a claim for benefits under ERISA § 502(a)(1)(B) for a breach of Plan terms (Count I); (2) a violation of ERISA § 102 (Count II); and (3) a violation of ERISA § 204(h) (Count III). Count I alleges that Nolan is entitled to a benefit based on the "A+B Promise." In the alternative, Nolan alleges in Counts II and III that the Guide inaccurately described the plan by failing to inform her of the potential downsides of the cash balance formula, including the likelihood that her benefits would be subject to the wear-away phenomenon.

On January 11, 2019, Defendants moved to dismiss the Complaint on the grounds that her claims were time-barred and that Counts II and III failed to state a claim. On July 9, 2019, the district court issued an opinion and order granting Defendants' motion, dismissing the Complaint, and entering judgment for Defendants. Nolan timely appealed.

## II. ANALYSIS

"We apply de novo review to a district court's grant of a motion to dismiss." *Hill v. Snyder*, 878 F.3d 193, 203 (6th Cir. 2017). "We construe the complaint in the light most favorable to the plaintiff, accept all well-pleaded factual allegations as true, and examine whether

the complaint contains 'sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Id.* (internal quotation marks omitted) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). We may also consider documents attached to the complaint. *Cates v. Crystal Clear Techs., LLC*, 874 F.3d 530, 536 (6th Cir. 2017). When a document contradicts allegations in the complaint, rendering them implausible, "the exhibit trumps the allegations." *Id.* (quoting *Williams v. CitiMortgage, Inc.*, 498 F. App'x 532, 536 (6th Cir. 2012)); *see also Creelgroup, Inc. v. NGS Am., Inc.*, 518 F. App'x 343, 347 (6th Cir. 2013) (explaining that a plaintiff cannot survive a motion to dismiss if a "written instrument plainly contradicts the pleadings"). If, on the other hand, the document provides support for both parties' version of events, we view the facts in the light most favorable to the plaintiff. *See Jones v. City of Cincinnati*, 521 F.3d 555, 561 (6th Cir. 2008) (accepting allegations in a complaint as true even where conflicts existed between those allegations and attachments to the defendants' motion to dismiss); *see also Carrier Corp. v. Outokumpu Oyj*, 673 F.3d 430, 442 (6th Cir. 2012) (same); *Luis v. Zang*, 833 F.3d 619, 631 (6th Cir. 2016) (resolving inconsistencies in the non-moving party's favor at the motion to dismiss stage).

A.    **Statute of Limitations**

We first consider DTE's position that Nolan's claims are barred by a six-year statute of limitations, which began to run in 2002. "Congress did not provide a statute of limitations for" non-fiduciary duty claims under ERISA, so courts "borrow the time limit from the forum state's most analogous cause of action." *Winnett v. Caterpillar, Inc.*, 609 F.3d 404, 408 (6th Cir. 2010). The parties agree that Nolan's claims are subject to a six-year limitations period. They dispute when the limitation period began to run. "Although state law sets the length of the statute of limitations, 'federal law' establishes when 'the statute of limitations begins to run.'" *Winnett*, 609 F.3d at 408 (quoting *Mich. United Food & Commercial Workers Union & Drug Emp. v. Muir Co.*, 992 F.2d 594, 598 (6th Cir.1993)). Under federal law, the limitations period starts "when the claimant discovers, or in the exercise of reasonable diligence should have discovered, the acts constituting the alleged violation." *Id.*

No. 19-1867                *Nolan v. Detroit Edison Co., et al.*                Page 13

### 1.    Count I (Breach of Plan Terms)

For Nolan's claims that DTE refused to honor "the A+B Promise," the parties agree we apply the "clear repudiation" rule, which holds that a claim accrues "when a fiduciary gives a claimant clear and unequivocal repudiation of benefits."  *Morrison v. Marsh & McLennan Cos.*, 439 F.3d 295, 302 (6th Cir. 2006).  DTE argues that Nolan's claims are time barred because the statute of limitations expired in 2008, six years after Nolan received the Guide.  According to DTE, the Guide clearly and unequivocally notified Nolan that the benefits she would receive differ from those to which she claims to be entitled.  Nolan alleges that the Guide froze and protected her traditional plan benefits in announcing the "A+B Promise," and that the clock began to run on her statute of limitations only when she learned in 2017 that DTE would not honor that promise.

The Guide and the Ayco presentation include support for Nolan's interpretation of the cash balance formula.  These materials do not plainly state that an employee will receive only the larger of the two pension benefits.  And Nolan's contention that she was entitled to the "A+B Promise" is also supported by the following:

- The Guide emphasizes that traditional plan benefit would be "frozen and protected," and participants would "stop earning benefits" under the traditional plan and "begin earning benefits under" the cash balance plan.
- Under the cash balance plan, benefits earned through the traditional plan "would be converted to an initial cash balance benefit," that "increases each year" with contribution credits, equal to 7% of the participant's eligible annual earnings and interest credits based on the 30-year Treasury rates.
- The Guide references the Ayco presentation, which includes a chart that we can reasonably infer shows benefits being calculated using the "A+B" formula.

Other language in the Guide, however, confuses the issue.  For example:

> Although the [cash balance plan] grows at a steady rate, do you find the [plan] does not catch up to the frozen accrued benefit under your Traditional Pension Plan for a number of years?  If this happens and you are planning to leave DTE Energy during this time, your pension may not grow.

(R. 1-5, PageID 254)  Although this language may cloud the issue, it does not clearly and unequivocally repudiate Nolan's understanding that she would be entitled to the sum of A (her

accrued traditional plan benefit translated into an initial cash balance) and B (contribution and interest credits she earned under the cash balance plan). The first sentence is a question that the examples provided throughout the DTE materials presumably help answer; those examples show only steadily increasing cash balance benefits.[4] Even where illustrations show the cash balance benefit as lower than the traditional benefit, the benefits are shown as having increased from the initial cash balance (i.e., the benefit accrued under the traditional plan as of transfer). The examples do not indicate that an employee will be entitled to only the larger of the cash balance or traditional plan benefit. Other parts of the Guide and attachments, moreover, support Nolan's view that she was entitled to the sum of her accrued traditional plan benefit and the contribution and interest credits that she would earn annually under the cash balance plan. DTE argues that the reference to a "catch up" period makes the "larger of" methodology obvious, but the corresponding graphs show scenarios where participants' benefits do not grow as quickly (i.e., "catch up") without explaining the wear away period. This interpretation is also supported by language in the Guide relied on by DTE referring to a slower growth rate than under the traditional plan.

Nolan's impression that she was entitled to the A+B Promise, that her pension would show some increase for her continued years of service, was reinforced by the 2004 cash balance plan statement sent to her. The letter accompanying the statement and signed by DTE's Project Manager for Retirement Services stated that she might "be eligible for additional benefits under a prior plan if a transferred employee." The statement showed her benefits increasing with contribution credits and interest credits without showing how the real value of her accrued benefit under the cash balance formula compared to her frozen and protected traditional plan benefit or explaining the wear away period.

Given that the materials attached to Nolan's Complaint include support for both parties' views and that, at this stage, we view the allegations and draw reasonable inferences in Nolan's favor, we cannot conclude that Nolan received a "clear and unequivocal repudiation of benefits" in 2002 when she accepted DTE's invitation to transfer from the traditional pension plan to the

---

[4]The modeling tool that DTE argues participants should have used to answer this question was not attached to the Complaint and is therefore not relevant to our review of DTE's motion to dismiss.

cash balance plan. Drawing all reasonable inferences in Nolan's favor, Nolan received notice that DTE would not honor the "A+B Promise" in 2017, and the clock began to run on her six-year limitations period only then. Nolan's breach-of-the-plan claim, Count I, was timely filed in 2018.

### 2.    Counts II and III (ERISA Disclosure Claims)

We next address whether Nolan's ERISA disclosure claims, Count II regarding ERISA § 102 and Count III regarding ERISA § 204(h), were timely filed. These claims overlap to some extent because ERISA § 102 and ERISA § 204(h) both require that an SMM, Summary of Material Modifications, be "written in a manner calculated to be understood by the average plan participant." ERISA § 102(a), ERISA § 204 (h)(2). Section 204(h) separately provides procedural timing requirements for when SMM notice must be delivered. ERISA § 204(h)(3).

Claims for violation of ERISA's disclosure requirements accrue when a plaintiff "knew or should have known" that a plan amendment "had the effect which triggered the notice requirement[.]" *Romero v. Allstate Corp.*, 404 F.3d 212, 225 (3d Cir. 2005). Nolan alleges that DTE failed to disclose that (i) employees who chose the cash balance plan would receive only the "larger of" the pension earned under the traditional or cash balance plan, meaning they would forfeit one or the other benefit, and that some employees would earn no new pension benefits despite continuing to work for many years; and (ii) employees' "initial cash balance benefit" might be significantly devalued rather than "frozen and protected" if interest rates fell. Nolan also claims that to the extent that DTE provided employees with the SMM notice required under ERISA § 204(h), it did so at least forty-five days too late. Whether a six-year statute of limitations bars Nolan's substantive and procedural disclosure claims are distinct questions and are addressed in turn.

DTE argues that Nolan knew or should have known enough to bring her substantive disclosure claims in 2002 when it provided her the Guide. DTE cites *Winnett v. Caterpillar, Inc.*, in which we held that a litigant "cannot postpone the accrual of a cause of action by claiming that, even though the company gave notice of a change in benefits in year one, the change did not affect the litigant's health or pocketbook until year four." 609 F.3d at 410.

In *Winnett*, retirees filed their ERISA § 102 claims too late because their employer provided them with "a new labor agreement that altered the healthcare benefits available to retirees" and "announced new costs for obtaining them" more than six years before the retirees filed their claims. *Id.* at 409. The participants filed claims only after their employer began deducting a monthly healthcare premium from the retirees' pension even though the Summary Plan Description delivered to them years earlier, "left no doubt about the legal stakes of the changes, notifying the retirees that monthly premiums 'will be required.'" *Id.* at 407, 412 (quoting the SPD).

Nolan counters that the Guide did not properly give notice of the change in benefits because it is consistent with her interpretation of the Plan. Nolan states that she did not know enough to bring either of her disclosure claims until 2017, when she received a copy of the Plan. Drawing all reasonable inferences in Nolan's favor, the Guide does not disclose that the cash balance plan would yield only the "larger of" the pension earned under the traditional or cash balance plan. Although the Guide asks a few questions that provide some clues about the potential for wear away—i.e., does their cash balance benefit "catch up to the frozen accrued benefit under" their traditional plan—it nowhere clearly explains the negative impact that the wear away period will have for employees who switch plans. Even where the Guide indicates that a participant's pension "may not grow initially or may grow at a slower rate than under the Traditional Pension Plan," rather than explaining what this means, language elsewhere in the Guide contradicts this statement, telling participants that their "cash balance benefit increases each year with two types of credits." Charts in the Ayco presentation also could lead a reasonable participant to believe her benefit was being calculated using the "A+B" formula.

To be sure, the Guide does say that participants might be better off remaining in the traditional plan, but Nolan has not alleged that the Guide fails to make this general disclosure. Nolan claims that the Guide fails to disclose that employees' "initial cash balance benefit" might be significantly devalued by falling interest rates, which is also supported by factual allegations in the Complaint and the exhibits. The Guide repeatedly says that participants' initial cash balance will be "frozen and protected." It says "[t]he pension benefit you earned at conversion under the Traditional Pension Plan is protected under" the cash balance plan.

Unlike in *Winnett*, where notices "left no doubt about the effect" of benefit changes, here the Guide is unclear. Nolan alleges that the first time she had enough information to bring her substantive disclosure challenges was in 2017 when she received a letter from the administrator and a copy of the Plan. And there is nothing in the documents attached to the pleadings that directly contradicts this allegation. Therefore, Nolan's claims regarding the Guide's substantive defects are not time barred.

Nolan's procedural claim that the Guide was provided at least forty-five days too late, however, is untimely. Under ERISA § 204(h), notice of plan amendments that provide "for a significant reduction in the rate of future benefit accrual" must be furnished "within a reasonable time before the effective date of the amendment." ERISA § 204(h)(3). An amendment that "eliminates or significantly reduces any early retirement benefit or retirement-type subsidy . . . shall be treated as having the effect of significantly reducing the rate of future benefit accrual." P.L. 107-16 (June 7, 2001), §659(b); ERISA § 204(h)(9) (2001). At the very least, Nolan knew or should have known in 2002 that transferring to the cash balance plan would eliminate her early retirement benefit because the Guide states that for those transferring from the traditional to cash balance plans, "the value of your early retirement factors" are "not included in your initial cash balance benefit." Nolan knew or should have known enough in 2002 to bring her claim that DTE failed to provide the SMM notice within a reasonable time before the effective date of the amendment. Nolan's procedural claim that the Guide was late is therefore time barred.

## B.     Violations of ERISA's Substantive Disclosure Requirements

Turning to the merits, DTE moved to dismiss only Nolan's ERISA disclosure claims (Counts II and III) for failure to state a claim. If the Plan document is found to not adopt an "A+B" methodology, Nolan alleges in Count II that she is still entitled to relief under ERISA § 102. Specifically, Nolan claims in Count II that DTE failed to adequately disclose the calculation method and other cash balance formula downsides, including the significant negative impact falling interest rates would have on employees' converted initial cash balances. In Count III, Nolan reiterates these allegations regarding the Guide's substantive disclosure defects. Count III also includes her ERISA § 204(h) procedural claim that we have found to be

time-barred. DTE argues that the Guide and other exhibits attached to the Complaint render Nolan's allegations regarding violations of ERISA § 102 and ERISA § 204(h) implausible.

      1.    <u>ERISA § 102 (Count II)</u>

Pursuant to ERISA § 102, plans must state their manner of operation in clear and understandable terms in the Summary Plan Description (SPD). ERISA § 102(a). The SPD "shall be written in a manner calculated to be understood by the average plan participant and shall be sufficiently accurate and comprehensive to reasonably apprise such participants and beneficiaries of their rights and obligations under the plan." *Id.* "A summary of any material modification in the terms of the plan" (SMM) must also "be written in a manner calculated to be understood by the average plan participant." *Id.* The SPD "shall contain" information related to circumstances which may result in the loss of benefits. ERISA § 102(b).

Department of Labor regulations enforcing ERISA § 102 require that plan administrators consider whether the SPD is written in a manner understandable to "the average plan participant." 29 C.F.R. § 2520.102-2(a). "The format of the summary plan description must not have the effect to misleading, misinforming or failing to inform participants and beneficiaries." *Id.* § 2520.102-2(b). "Any description of exceptions, limitations, reductions, and other restrictions of plan benefits shall not be minimized, rendered obscure, or otherwise made to appear unimportant," and "[t]he advantages and disadvantages of the plan shall be presented without either exaggerating the benefits or minimizing the limitations." *Id.*

In *Osberg v. Foot Locker Inc.*, disclosure materials distributed to plaintiffs violated ERISA § 102 because they led plaintiffs to reasonably believe they would receive their accrued traditional plan benefit plus the added benefits they continued to accrue, but in reality, participants were entitled only to the larger of their now-frozen and stagnant traditional plan benefits or the differently calculated cash balance benefit. *Osberg v. Foot Locker, Inc.*, 862 F.3d 198, 205 (2d Cir. 2017). A memo distributed to employees stated that participants would "have the option of taking the lump sum payment equal to your account balance" upon retirement. *Id.* at 204. This language "lacked any description of wear-away or any indication that the conversion would cause a benefits freeze for most participants." *Id.* "That false impression was

further reinforced by 'total compensation' statements that participants began receiving annually and which showed participants' account balances increasing each year due to the receipt of pay and interest credits." *Id.*

As in *Osberg*, aspects of the Guide have the effect of obscuring that their actual take-home pension benefit amount would remain stagnant for anyone experiencing wear away. Specifically, the examples in the Guide compare only the "present values," i.e., lump-sum values under each retirement program. The false impression is reinforced by the chart in the Ayco presentation showing employees' accounts increasing with contribution and interest credits without explaining how the lump-sum cash balance account would be translated into an annuity. For employee Terry—whose accrued benefit under the traditional plan ($1,788 per month) translated into a lump-sum initial cash balance benefit of $63,226—the chart showed his cash balance benefit growing to $71,661 by the end of 2002 once interest and compensation credits of $3,465 and $4,970 were added to his account. From this information, participants could reasonably infer that they are eligible for their protected traditional plan benefit plus benefits that accrued under the cash balance plan as they continued to work. The Guide arguably led participants to believe that the benefits they received at retirement would inevitably increase beyond their already earned annuity because the Guide did not clearly explain the effect of the wear-away period after converting to the lump sum.

Also, because the Guide arguably failed to clarify that the initial cash balance could be significantly devalued by falling interest rates, a participant would not necessarily recognize this significant risk in switching to the new plan. When an employee switched from the old to the new plan, DTE would convert her earned annuity into an opening balance for the cash balance formula using the current interest rate. In other words, they would calculate the present value of the annuity and use that figure as the starting point for her new account. Later, when the employee retired, they would take her account balance—her starting sum plus any accrued value—and convert it back into an annuity using whatever interest rate applied then. If the interest rate used for the first conversion exceeded the interest rate for the second conversion, the value of the initial cash balance could be substantially lost.

In *Amara v. CIGNA Corporation*, defendants also failed to provide adequate notice under ERISA § 102 and ERISA § 204(h).  There, CIGNA told employees that under the new cash balance plan, "your benefit will grow steadily throughout your career."  *Amara*, 775 F.3d at 515 (quoting SPD).  "It also told each employee that his or her 'opening balance [in the new cash balance plan] was equal to the lump sum value of the pension benefit [he or she] earned through'" the old, traditional plan.  *Id.* (quoting the SPD)  This information was misleading, however, because the new plan did not preserve the full value of each employee's accrued traditional plan benefits.  Employees' initial cash balance was devalued in part:  if an employee elected to receive an annuity at retirement under the cash balance plan, "the price of the annuity would be affected by the then-current interest rate (so that an employee would receive a lower annual benefit for the same lump sum price if interest rates were low when he or she retired)." *Id.* at 516.

Here too, the disclosure materials indicate to employees that their benefits will grow steadily throughout their careers.  Employees were told that their benefits would increase each year with contribution and interest credits.  And every example shows employees earning new benefits after the transfer.  None of the graphs represent the effect of wear away and the lack of increase in the actual realized value of their available pension benefits.  It is thus reasonable to infer from the graphs that employees electing to transfer to the cash balance plan would earn new benefits beyond their initial cash balance benefit from further years of employment.

DTE argues that the Guide explained that benefits depend "on the retirement program you choose," including "changes in your pay, years of service," and "changes in the interest rates."  But this disclosure that benefits would be impacted by interest rates does not make clear that decreasing interest rates might cause the participant's initial cash balance benefit to be significantly devalued because of the extended wear-away period.  That "changes in interest rates" would affect benefits can be interpreted to mean merely that the amount of interest credits earned annually under the cash balance formula would depend on interest rates.  This interpretation makes sense in the context of the graphs provided to help employees compare benefit accrual rates under varying interest rates, which show only that *growth* of the traditional and cash balance benefits depends on interest credits.

DTE also argues that we should not rely on *Osberg* or *Amara* because it claims that employers in those cases deliberately misled participants and that the transfers to cash balance plans were mandatory. Under ERISA § 102, however, malicious intent need not be alleged to state a claim. Section 102 requires certain information to be provided to plan participants in a form that is accurate, comprehensive, and in clear language understandable to average plan participants. A plaintiff, therefore, may plead factual allegations showing that a notice had the "effect" of "misleading, misinforming or failing to inform participants and beneficiaries." 29 C.F.R. § 2520.102-2(b).

For the reasons already described, the Guide and other exhibits attached to Nolan's Complaint do not plainly contradict her allegations that the Guide failed to adequately inform her of the potential downsides of the cash balance formula, including that she would not be entitled to the A+B Promise and that her purportedly "frozen and protected" initial cash balance could shrink significantly if interest rates fell. Drawing reasonable inferences in Nolan's favor, the average plan participant could not intuit the concept or likelihood of the wear-away phenomenon or the effect that dropping interest rates would have on the conversions of the opening cash balance. Nor can we say at this stage that an average employee would have understood these concepts based on questions posed like: "Although the [cash balance plan grows at a steady rate, do you find the [plan] does not catch up to the frozen accrued benefit under your Traditional Pension Plan for a number of years?" and "Do you notice more than one crossover point? Which benefit is better if you expect to leave DTE Energy at an age before or after each crossover point?" These questions ultimately communicate only that some participants might be better off remaining in the traditional benefit plan, but they do not disclose how the calculations actually work. The suggestion of a "catch up" period, for example, can be interpreted to inform a participant only that her benefit might grow faster under the traditional plan. The same is true of the phrase "crossover point," which can reasonably be interpreted as expressing a difference in benefit accrual between the traditional and cash balance plans without explaining that a participant is eligible only for the larger of the two benefits. These alternative interpretations are particularly compelling in light of other parts of the Guide and exhibits that, construed in Nolan's favor, support her allegations regarding the A+B Promise.

DTE also cites *Jensen v. Solvay Chemicals, Inc.*, 625 F.3d 641 (10th Cir. 2010) to support its view that Nolan has failed to state a claim under ERISA § 102's disclosure requirements.  In that case, plaintiffs did not allege that their employers' disclosures were inaccurate, only that they were deficient.  625 F.3d at 651.  Unlike in this case, the notice in *Jensen* showed the actual dollar amount of the annuity benefit under the traditional plan and cash balance plan for sixteen hypothetical employees, described in detail the negative impact of declining interest rates on the value of annuity benefits, and discussed a fifty-four-year-old employee who would earn no new benefits for seven years.  *Id.* at 647–49, n.8–n.9.  The notice explained the impact of interest rates this way:

> Some participants may notice that while their lump sum benefit always grows, their monthly benefit may not increase at the same rate or at all in some years. This could be due to changes in prevailing interest rates.  The lower the interest rate used to convert account balances to annuities, the smaller the annuity equivalent of your account balance will be (and vice versa).

*Id.* at 649 n.9.  Importantly, the notice also clearly explained the concept of the wear-away period and provided an example of a six-year wear-away period.  *Id.* at 649, 656.

In this context, the Tenth Circuit affirmed a district court's granting of the employer's motion for summary judgment, finding the notice provided by the employer in *Jensen* satisfied ERISA § 204(h).  Because the notice satisfied ERISA § 204(h), it also satisfied ERISA § 102. *Id.* at 657 ("a notice that complies with the disclosure requirements of [ERISA] § 204(h) would satisfy in that respect the requirements for an SMM [under ERISA § 102]").  The court concluded that "wear-away need not be disclosed as a new eligibility requirement after conversion" and that the notice adequately demonstrated that participants would receive the greater of their benefit under the old method, frozen as of the new plan's commencement, or the benefit earned under the new plan, which could take significant time to catch up to the previously accrued benefit.  *Id.* at 658.

The Guide and Nolan's allegations distinguish this case from *Jensen*.  Nolan alleges not only that the Guide provided deficient notice, but also that it misled plan participants by failing to disclose the wear away period or the impact falling interest rates could have on what they believed was a "frozen and protected" initial cash balance.  Unlike the notice in *Jensen*, which

disclosed the likelihood of wear away through examples, none of the examples provided by DTE demonstrate the lack of added value to the actual received benefit amount during the wear away period. The *Jensen* guide told participants that they may notice differences between their growing lump-sum benefit and their monthly benefit, which might not "increase at the same rate or at all" because of "changes in prevailing interest rates." *Id.* at 649 n.9. This concept was further illustrated by the notice provided in *Jensen* because the examples compared expected monthly benefits under the old and new plan for different ages, compensation, and years of service. In contrast, the DTE materials neither explain this difference between the growth rate of a participants' lump-sum- and monthly-benefits nor offer examples of expected monthly benefits. Instead, all the DTE examples show employees' initial cash balance benefits increasing to larger lump-sum benefits as interest and compensation credits are accrued.

In sum, Nolan has a colorable claim that DTE did not explain in plain English in the Guide or the Ayco presentation materials its position on appeal that employees transferring to the cash balance plan would not actually receive any new benefits if the benefit accrued under the new plan did not catch up to their frozen traditional plan benefit. Likewise, DTE failed to explain the effect that interest rates could have on depreciating the already-earned benefits during conversion rather than simply slowing the growth of added benefits. Nolan stated a plausible claim that DTE's notice was defective under ERISA § 102 because it failed to describe the plan in a manner understandable to the average plan participant.

### 2.    ERISA § 204(h) (Count III)

Nolan's procedural claim under ERISA § 204(h) is time barred, but her claim that DTE failed to comply with the substantive disclosure requirements of § 204(h) remains. Just as ERISA § 102(a) requires that SPDs and SMMs "be written in a manner calculated to be understood by the average plan participant," ERISA § 204(h) requires that notice of an amendment providing "for a significant reduction in the rate of future benefit accrual," i.e., a Summary of Material Modifications, be "written in a manner calculated to be understood by the average plan participant." ERISA § 204(h)(2).

Despite this overlapping instruction, the ERISA § 102 and ERISA § 204(h) inquiries diverge somewhat. For example, in the case of an "egregious failure to meet any" ERISA § 204(h) requirement, plaintiffs are entitled to special relief:

**(i)**     the benefits to which they would have been entitled without regard to such amendment, or

**(ii)**    the benefits under the plan with regard to such amendment.

ERISA § 204(h)(6)(A)(i)–(ii). Although Nolan's Complaint alleges that DTE's failure to provide her with § 204(h) notice was "egregious," entitling her to this additional relief, on appeal Nolan does not provide an argument that any ERISA § 204(h) violations rise to the level of egregious failures.[5]

To the extent that Nolan seeks relief under ERISA § 204(h) that cannot be obtained under ERISA § 102, such further relief is available in this case only if Nolan's allegations show DTE failed to make a "good faith effort" to comply with § 204(h)'s requirements. When Congress amended § 204(h) in 2001 to include substantive requirements similar to those in § 102, it specified that until the Treasury Department issued new regulations interpreting ERISA § 204(h), a plan was treated as meeting the section's updated requirements if it made a "good faith effort to comply with such requirements." P.L. 107-16 (June 7, 2001), § 659(c)(2). This "good faith" standard applies to Nolan's § 204(h) claim because DTE provided her with notice during the period between 2001 and 2003 when the good-faith standard governed.

The allegations in and the materials attached to the Complaint show that DTE satisfied the requirement to make a good faith effort to comply even though the notice provided to employees was ultimately inadequate under ERISA § 102. Even assuming that the Guide does not successfully convey information in plain English about the wear away period or the impact of interest rates on employees' supposedly "frozen and protected" initial cash balance to an average plan participant, it does contain "explanations, comparisons, and cautions," and indicate a "multi-modal informational campaign." *Nolan v. Detroit Edison Company, et. al.*,

---

[5]Nolan does label DTE's violations "egregious" in her Statement in Support of Oral Argument, but she does not discuss the statutory definition of "egregious" or argue that DTE's failures meet this definition in her analysis.

-- F.Supp.3d --, No. 18-13359, 2019 WL 2996178, at *42 (E.D. Mich. July 9, 2019).  Thus, even accepting Nolan's allegations as true, Nolan has failed to state a claim under the good-faith standard applicable to her ERISA § 204(h) claim.

### III.  CONCLUSION

For the foregoing reasons, we **REVERSE** the district court's grant of DTE's motion to dismiss Counts I and II, **AFFIRM** the dismissal of Count III, **VACATE** the judgment below, and **REMAND** for further proceedings consistent with this opinion.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

No. 19-1867

LESLIE D. NOLAN,

     Plaintiff - Appellant,

     v.

DETROIT EDISON COMPANY; DTE ENERGY CORPORATE
SERVICES, LLC; DTE ENERGY COMPANY RETIREMENT PLAN;
DTE ENERGY BENEFIT PLAN ADMINISTRATION COMMITTEE;
JANET POSLER; QUALIFIED PLAN APPEALS COMMITTEE;
MICHAEL S. COOPER; RENEE MORAN; JEROME HOOPER,

     Defendants - Appellees.

> **FILED**
> Mar 23, 2021
> DEBORAH S. HUNT, Clerk

Before:  BATCHELDER, STRANCH, and NALBANDIAN, Circuit Judges.

# JUDGMENT

On Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.

THIS CAUSE was heard on the record from the district court and was argued by counsel.

IN CONSIDERATION THEREOF, it is ORDERED that the judgment of the district court is AFFIRMED IN PART, REVERSED IN PART, and REMANDED for further proceedings consistent with the opinion of this court.

**ENTERED BY ORDER OF THE COURT**

Deborah S. Hunt, Clerk